## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NOT AN LLC d/b/a/ JSD SUPPLY, | Case No._____ |
| Plaintiff, | |
| v. | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; and GARY M. RESTAINO AS THE ACTING DIRECTOR OF ATF, | |
| Defendants. | |

### VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Now comes Plaintiff, through counsel, and for its Complaint states as follows:

1.  This is an action for declaratory and injunctive relief, challenging the authority of Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to have issued a May 9, 2022 Cease-and-Desist Order ("C&D Order") to Plaintiff, Not an LLC d/b/a JSD Supply ("JSD Supply"), ordering Plaintiff to halt sales of certain unspecified products (or unspecified combinations of products) from its inventory, even though all such items are entirely unregulated by federal law and completely outside ATF's authority to control.

2.  Defendants' vague C&D Order, without any statutory authority, has forced Plaintiff to immediately suspend all retail sales of its entire product line, causing immediate and substantial financial losses, violating the Fifth Amendment, and infringing on the Second Amendment rights of Plaintiff and its customers.  Accordingly, Plaintiff is also seeking emergency relief, in the form of a temporary restraining order pursuant to FRCP Rule 65(b), enjoining Defendants from in any way enforcing the provisions of its C&D Order against Plaintiff.

3.      **Plaintiff respectfully seeks a hearing on its request for a temporary restraining order and/or preliminary injunction as soon as possible.  Time is of the essence.**

4.      Contemporaneously with the filing of this Complaint and Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction, counsel for Plaintiff has caused a true and correct copy of its filing to be delivered to counsel for Defendants, via e-mail, fax, and has provided notice of the filings by phone.

**PARTIES**

5.      Plaintiff Not an LLC d/b/a JSD Supply, is a Pennsylvania limited liability corporation, having its principal place of business at 1052 New Castle Road, Prospect, PA 16052, within Butler County, Pennsylvania, and within this district.  Plaintiff is primarily a retailer of firearm-related products, both in this jurisdiction and across the United States (where lawful).   On the same day that Plaintiff received the C&D Order, it ceased all retail sales of firearm parts and related products.

6.      Defendant U.S. Department of Justice ("DOJ") is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530. DOJ is the agency responsible for enforcing federal firearms laws.

7.      Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a component within DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226.  ATF investigates violations of and enforces compliance with federal firearms laws.

8.      Defendant Gary M. Restaino is the Acting Director of ATF pursuant to a presidential designation which occurred April 25, 2022, and thus is responsible for overseeing the

ATF's action challenged herein.[1]

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.  This Court has authority to grant the remedy Plaintiff seeks under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

10.     Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e) and 1391(b)(2).  The events giving rise to this claim occurred in Butler County, Pennsylvania.

## STATEMENT OF FACTS

11.     The Gun Control Act of 1968 ("GCA") is a comprehensive gun control scheme designed to provide "support to Federal, State, and local law enforcement officials in their fight against crime and violence," however "it is not the purpose of this [Act] to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms…" *See* 90 P.L. 618, 82 Stat. 1213, 1214, § 101.

12.     Likewise, Congress stated that the GCA was "… not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provision of…" the Act.  *Id*.

13.     The GCA established the definition of "firearm" for purposes of federal firearm law and regulations, to mean: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or silencer; or (D) any destructive device."

---

[1] https://www.justice.gov/opa/pr/presidential-designation-atf-acting-director#:~:text=Biden%20signed%20an%20order%20designating,Firearms%20and%20Explosives%20(ATF).

*See* 18 U.S.C. § 921(a)(3).

14.     The GCA also states that "No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a licensed to do so from, the Secretary."  18 U.S.C. § 923(a).

15.     The GCA also affixed penalties, including fines and prison time, for various violations of the Act, including the catch-all provision, "[w]however violates any provision of this chapter… shall be fined not more than $5,000 [since updated], or imprisoned not more than five years, or both…"  18 U.S.C. § 924(a).

16.     The term "80% receiver" is a colloquial term used within the firearms industry to denote a product that is an incomplete and unfinished firearm frame or receiver.  An 80% receiver is not a "firearm" under the GCA because it has not yet reached a stage of manufacture to be classified as such by ATF.  ATF has often called 80% receivers "blanks" or "castings."

17.     It has been Defendant ATF's longstanding position that: "[r]eceiver blanks that do not meet the definition of a 'firearm' are not subject to regulation under the Gun Control Act (GCA)."[2]

18.     80% frames and receivers have become increasingly popular within the firearms community by those who wish to lawfully manufacture their own privately made firearm,[3] but without having to do so from scratch.  Rather, an 80% receiver can be purchased and, with additional tools and labor and skill, can be manufactured by the end user into a complete and finished firearm frame or receiver.  Then, with the addition of the remaining firearm parts, this

---

[2] https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal.

[3] As ATF's website explains, "a license is not required to make a firearm solely for personal use." https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use.

frame or receiver can be assembled into a functional firearm.

19.     Plaintiff is, primarily, a retailer of firearm-related parts, tools, and accessories, including (i) so-called "80% frames or receivers," and (ii) various firearm parts, tools, and accessories.

20.     None of the products sold by Plaintiff is in any way regulated by the GCA.

21.     Indeed, ATF has specifically and repeatedly explained that firearm parts (such as barrels, triggers, springs, etc.) are *not* firearms under federal statutory law including the GCA, and thus are entirely *unregulated* by the ATF and unable to be regulated by ATF absent an additional grant of statutory authority.

22.     Importantly, ATF also has specifically and repeatedly determined that the "80% frames and receivers" which Plaintiff sells are *not* firearms under the GCA, and thus are entirely *unregulated* by the ATF.

23.     In other words, ATF has explicitly recognized, and expressly sanctioned, the unregulated sale of *every single product* that JSD Supply offers for sale.

24.     Additionally, in the past ATF has expressly *approved* the sale of *combinations* of these items, in whatever form or permutation – a conclusion that is hardly surprising, as each the components individually are *unregulated* by federal law.  In other words, ATF's own guidance confirms that the agency is without any statutory authority to regulate any of the products sold by Plaintiff.

25.     However, beginning in December of 2018, without any change to the underlying regulation, let alone any change to the statute by Congress and, without issuing any public-facing guidance on the topic, ATF began to implement a series of secret and unannounced policy changes regarding the sale of "80% frames and receivers," the tools used to manufacture them, and the

firearm parts used in the assembly process.

26.    Each time since then that ATF has moved the goalposts by changing its policy, the industry – including Plaintiff – has attempted in good faith to adapt to and comply with ATF's demands, despite the lack of any legal authority for ATF's position.

27.    ATF's issuance of a C&D Order to Plaintiff represents the most recent iteration of ATF's secret and unannounced policy changes about "80% frames and receivers" – and, in fact, ATF's policy as represented to Plaintiff has continued to evolve even as it now presses its new position against this single retailer.

28.    The manner in which ATF is enforcing new and secret rules about "80% frames and receivers" is wholly inconsistent with the rule of law.  On the contrary, "[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian régimes."  *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009).

29.    Without judicial intervention, ATF will be rewarded in its unlawful action against Plaintiff as a seller of "80% frames or receivers" and be encouraged in its efforts to, without any statutory authority for doing so, incrementally move the goalposts to effect policy change (at the behest of the current administration which repeatedly has expressed hostility to the Second Amendment rights of Americans, and announced its intention to enact gun control policy without Congress[4]).

30.    Indeed, ATF's modus vivendi has been to demand compliance with its vague,

---

[4]  *See, e.g.*, https://joebiden.com/gunsafety/ (promising to "[s]top 'ghost guns,'" or firearms "assembl[ed] . . . on [one's] own . . . by buying a kit of disassembled gun parts….").

arbitrary, and often unlawful policies and orders directed to the firearms industry and gun owners, which often carry explicit or implicit threats of criminal prosecution, seeking to bully Americans into yielding to its unlawful actions through use of intimidation, harassment, and threats.

31.     This Court's intervention to protect the firearms industry and gun owners is necessary to reign in a branch of the federal government that is acting without any legal authority, and return the constitutional lawmaking power to the Congress, the only branch of government to which it was entrusted by Article I of the U.S. Constitution.

**ATF's Cease-and-Desist Order to JSD Supply, Dated May 9, 2022**

32.     Shortly after 9:00 AM on the morning of May 12, 2022, two ATF agents knocked on the door of Plaintiff JSD Supply.

33.     The purpose of the agents' visit was to hand-deliver Plaintiff a copy of an ATF Cease-and-Desist Order, issued and "signed" (actually digitally stamped) by Matthew P. Varisco, the Special Agent in Charge of the ATF Philadelphia Field Division.  Exhibit "1".

34.     Although delivered on Thursday, May 12, 2022, the ATF C&D Order was dated three days prior, or Monday, May 9, 2022.

35.     The C&D Order stated that "[t]his letter is in regard to the products sold by your company, JSD Supply…."

36.     The C&D Order characterized these "products" as "JSD 80% Lower Receivers, Jigs, and Gun Parts Kits."

37.     The C&D Order claimed that "ATF[] is aware that JSD Supply is selling and transferring all the components necessary to produce a fully functional firearm to a single customer in one or multiple transactions."

38.     In support of this allegation, the C&D Order advanced **two** separate **theories**.

39.     **First**, the C&D Order claimed that "ATF has held that *kits which include all*

*components necessary* to produce a functional firearm, including the jig or template used to finish the unfinished frame or receiver, the slide assembly, and the necessary components to complete the frame or receiver are themselves properly classified as 'firearms' under the GCA."  Emphasis added.

40.    The C&D Order further claimed that "[s]pecifically, *these kits* are a weapon that may readily be converted to expel a projectile by the action of an explosive. *These kits* are, therefore, firearms under the GCA and have always been firearms pursuant to statute."

41.    The C&D Order then announced its **second** theory, that "the *complete set of component parts* necessary to create a firearm *need not be packaged or sold in a single container or a single transaction* in order to be considered a firearm."  Emphasis added.

42.    Rather, the C&D Order claimed that "selling the *necessary components* to produce a functional firearm to the same person through multiple purchases or *structured* transactions at different times instead of a single sale is equivalent to selling the complete kit to the customer. … These piecemeal sales circumvent the requirements of the GCA and are unlawful."  Emphasis added.

43.    The C&D Order then claimed that ATF's legal theories were based on a position that ATF has "always" held, and in no way were predicated on the agency's coming formal administrative omnibus rule change announced in "regulations and definitions under Final Rule 2021R-05F," which was noticed to take effect on August 24, 2022 (*i.e.*, more than three months *after* the date of ATF's C&D Order).

44.    After announcing the agency's legal theories, the C&D Order ordered Plaintiff to take **three** separate **actions**.

45.    **First**, the C&D Order ordered Plaintiff to "[c]ease and desist the sale of firearms

without a license." *Id*. at 2.

46.     **Second**, the C&D Order ordered Plaintiff to "[c]ease and desist the sale of the full set of component parts necessary to produce or readily converted [sic] into a fully functioning firearm, whether in a single transaction or in multiple structured transactions."

47.     **Third,** the C&D Order ordered Plaintiff to "[i]mmediately and fully comply with and abide by all laws and regulations governing the sale of firearms, frames, and receivers."

48.     Finally, the C&D Order offered that "[f]or any questions, please contact Special Agent in Charge, Philadelphia Field Division, Matthew P. Varisco…."

**ATF's C&D Order Provided No Specific Instructions or Guidance**

49.     The ATF C&D Order, although taking issue with "the products sold by your company," and clearly ordering Plaintiff to *stop* selling some of those products, provided no further clarity or guidance as to how to achieve compliance with ATF's demands, which are vague and imprecise.

50.     This has made it impossible for Plaintiff to ensure its compliance, except by shutting down all retail sales, as Plaintiff has done.

51.     **First**, the C&D Order did not identify any "kits which include all components necessary to produce a functional firearm" that Plaintiff is alleged to sell.

52.     In fact, Plaintiff does not sell any such complete, prepackaged "kits" from which a firearm can be manufactured and them assembled.

53.     **Second**, the C&D Order did not identify with any specificity which of Plaintiff's "products," "parts," or "components" could not be sold – or not sold in combination with other specific "products," "parts," or "components."

54.     **Third**, the C&D Order did not explain how Plaintiff is expected to avoid allegedly "structured" transactions, and avoid unknowingly transferring various unclear combinations of

"products," "parts," or "components" to a single person.

55.     Of course, even if the notion of a "structured" transaction is now to be imported from the world of finance into the world of firearms by ATF's arbitrary decree, it is not Plaintiff, but rather its customers, who would be alleged to "structure" their transactions by choosing which of Plaintiff's "products," "parts," and "components" they wish to purchase at a given time or at different times.  Of course, however, there is no law prohibiting Americans from acquiring the parts to manufacture their own firearms, whether in a single or multiple transactions from one or more parts sellers.

56.     Moreover, many of Plaintiff's customers have made purchases in the past over many years, and ATF's C&D Order did not put any temporal limitations on its warning to avoid "structuring."   In other words, ATF has not explained whether the sale of a firearm part to a customer years ago would prevent the sale of a different firearm part today.

57.     An additional complexity is created because many of Plaintiff's customers have made entirely lawful purchases of firearms parts and related products at gun shows, often in cash, without there being any record (such as internet purchase order) that can identify specific items purchased.

58.     Finally, when investigating other companies which sell "80% frames and receivers" and firearm parts, ATF has used undercover informants, including convicted felons, along with fictitious names, fake addresses, undercover computers masked by use of VPNs, *etc*., in order to purchase products.[5]  Thus, there is simply no way for Plaintiff to conduct business without running the risk of criminal prosecution based on Defendants' vague "structuring" theory, if an undercover

---

[5] See ATF warrant affidavit in the case of Polymer80, Inc. ("P80 Warrant") at ¶¶46, 49-50, 66 (https://s.wsj.net/public/resources/documents/ghostraid-121420-warrant.pdf).

agent or informant makes purchases to acquire all the component parts from which a firearm can then be manufactured and assembled.

**Plaintiff's Attempts to Clarify ATF's Vague C&D Order**

59.     For the reasons stated above, after receiving ATF's C&D Order, Plaintiff could conceive of no way to conduct retail sales and still ensure compliance with the agency's new and novel, as well as vague and unclear, demands.

60.     Thus, out of an abundance of caution, Plaintiff was forced to suspend retail operations, soon after receiving ATF's C&D Order on the morning of May 12, 2022.  As explained further below, this included halting all online retail sales of its website, refunding pending orders, and canceling Plaintiff's appearance at gun shows over the weekend of May 14-15, 2022, causing a substantial loss of gross and net income to Plaintiff.

61.     Thus, no argument can be made that Plaintiff has not fully and immediately complied with ATF's vague, unclear, and unlawful demands in its C&D Order, whatever those demands might be.

62.     After halting retail sales, Plaintiff immediately sought ATF guidance by reaching out to ATF SAC Varisco, whose C&D Order had promised he would be available for "any questions."

63.     However, Plaintiff's call was not returned by SAC Varisco, but instead by a staff attorney in ATF's Philadelphia Field Division.

64.     That same day, counsel for Plaintiff spoke with two ATF attorneys about the matter, including ATF Associate Chief Counsel.  The substance of that conversation, including Plaintiff's good faith attempts to receive guidance and specificity from ATF about the demands in its C&D Order is recounted in Plaintiff's letter to ATF.   Exhibit "2."

65.     **First**, counsel for Plaintiff explained that JSD Supply does not sell "complete kits,"

as referenced in ATF's C&D Order.  *Id*. at 2.

66.     ATF did not dispute this.  *Id*.

67.     **Second**, Plaintiff's counsel sought guidance as to which specific part(s) could be entirely removed from JSD Supply's inventory, to result in a fully compliant situation where Plaintiff would not be viewed as selling "*all* the components necessary to produce a fully functional firearm…." *Id*. at 3.

68.     ATF's representatives declined to provide confirmation or guidance on this issue. *Id*.

69.     On the contrary, ATF representatives stated that, in fact, it *may not be permissible* to simply remove one or more "easily available components" from inventory, in order to achieve compliance.  This position stands in stark contrast to the C&D Order, which on its face prohibits only the sale of "*all* the components necessary."  *Cf*. Exhibit "2" at 3 with Exhibit "1" at 1.  ATF's position, it would seem, continues to evolve.

70.     **Third**, Plaintiff's counsel asked whether JSD Supply would be in compliance with the C&D Order if it *entirely stopped selling 80% frames and receivers*, and only sold firearm parts such as barrels, springs, triggers, etc.  *Id*. at 3.

71.     Even though there is no reasonable question that such firearm component parts are entirely unregulated by federal law, ATF representatives could not even confirm that Plaintiff would be in compliance with ATF's C&D Order if it continued operations on such a narrow, limited, clearly lawful basis.

72.     With ATF counsel being unable or unwilling to provide any specific guidance, undersigned counsel prepared and sent a letter to ATF on May 13, 2022, posing the same two, specific questions as above, and asking ATF for definitive guidance by Wednesday, May 18, 2022

about how to comply with the agency's C&D Order.

73.    ATF confirmed receipt of Plaintiff's letter on May 14, 2022.

74.    However, as of the date of this filing, ATF has not provided any substantive response to Plaintiff's letter.

75.    Plaintiff thus has attempted in good faith to receive guidance from ATF as to how to comply with its C&D Order, but the agency has refused to provide any guidance at all, and has only raised further ambiguity.

### ATF Has Specifically, Expressly, and Repeatedly Approved the Unregulated Sale of Every Single Item in Plaintiff's Inventory

76.    As explained above, Plaintiff is predominately a retailer of firearm parts (slides, barrels, triggers, springs, and numerous other small parts), in addition to precursor, unfinished "80% frames and receivers," sometimes accompanied by jigs/mills, drill bits, and other tools that may be used by the customer in the private manufacturing process.  Plaintiff ***does not sell*** firearms, the frames or receivers of firearms, or any other item regulated by the GCA or ATF.

77.    None of the items in Plaintiff's inventory is governed, restricted, or regulated in any way by the Gun Control Act.

78.    Fortunately, this Court does not have to take Plaintiff's word for it, as ATF has repeatedly and expressly confirmed the *unregulated* nature of these items.

79.    Over the years, ATF has issued numerous classification letters, rulings, and other statements, opining that it has no authority to regulate the very products that Plaintiff offers for sale.

### ATF Has Repeatedly Stated that it Does Not Regulate Firearm Parts

80.    **First**, ATF has clarified numerous times that the Gun Control Act does not regulate firearm parts.

81.     For example, ATF's website answers the question "Does the GCA control the sale of firearms parts?" with the response "**_No_**, except that frames or receivers of firearms are 'firearms' as defined in the law and are subject to the same controls as complete firearms."[6]

82.     Additionally, in a recent search warrant affidavit, ATF explained that "[p]istol slides are not regulated by ATF, and may be sold, purchased, or transported in interstate commerce fully assembled."  P80 warrant at ¶12.

83.     Similarly, in a recent court filing, ATF explained that "Congress has chosen to exclude firearms parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm."  *California v. ATF*, 3:20-cv-06761 (N.D. Ca.) (ECF # 29, Govt. Motion to Dismiss).

84.     Likewise, in a recent May 2021 Notice of Proposed Rulemaking, ATF explained that "Prior to passage of the GCA, the Federal Firearms Act of 1938 ('FFA') regulated all firearm parts," but that "[d]uring debate on the GCA and related bills introduced to address firearms trafficking, Congress recognized that regulation of all firearm parts was impractical."  86 *Fed. Reg.* 27720.

85.     In spite of all of these clear statements that firearm parts are unregulated, ATF has been either unwilling or unable to confirm that Plaintiff can continue operations, even on a limited basis selling *only* firearm parts *and not* "80% frames and receivers," and be in compliance with ATF's C&D Order.

### ATF Has Repeatedly Approved of Incomplete 80% Frames and Receivers as Non-Firearms

86.     **Second**, ATF does not regulate the manufacture or sale of unfinished, non-firearm "80% frames and receivers."

---

[6] https://www.atf.gov/firearms/qa/does-gca-control-sale-firearms-parts.

87.     As ATF's website explains, "ATF has long held that … [r]eceiver blanks that do not meet the definition of a 'firearm' are not subject to regulation under the Gun Control Act (GCA)."[7]

88.     Indeed, over the course of many years, ATF has issued numerous classification letters concluding that a wide variety of so-called "80% frames and receivers" are not firearms, because they have not reached a sufficient stage of completion to result in classification as a GCA firearm.

89.     Upon information and belief, ATF has issued a classification letter with respect to *every single one* of the types of "80% frame or receiver" that Plaintiff offers for sale.

90.     **First**, in January of 2004, ATF approved of a so-called 80% receiver for a "Government 1911A1 type casting," holding that it was not a firearm.  Exhibit "3" at ATF0058.

91.     Plaintiff's inventory includes such 1911-style, 80% frames of which ATF has specifically approved.

92.     **Second**, in May of 2009, ATF approved of an AR-15 80% receiver, holding that it "does not contain any of these critical [impermissible] features" and is "not yet finished to the point at which it would be classified as a firearm."  *See* Exhibit "4."  Likewise, in 2013, ATF *established standardized rules* for 80% AR-15 style receivers by promulgating ATF Technical Bulletin 14-01, entitled "Unfinished '80%' AR-15 Style Receivers."  In this bulletin, ATF explained that "an AR-15 type receiver which has no machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity) might not be classified as a firearm.  Such a receiver could have all other machining operations performed…."  *See* Exhibit "5" (emphasis

---

[7] https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal.

original).

93.     Plaintiff's inventory includes such AR-15 80% receivers, of which ATF has specifically, repeatedly, and expressly approved.

94.     **Third**, in November of 2015, ATF approved of a "Glock-type 'GC9 Blank'" frame manufactured by Polymer80, Incorporated, on the basis that this Glock-style unfinished frame did not have certain finishing operations performed.  *See* Exhibit "6."  Two years later, in January of 2017, ATF approved of another Polymer80 Glock-style, "compact" size "PF940C" unfinished frame, on the same theory.  *See* Exhibit "7."

95.     A large portion of Plaintiff's inventory includes these Polymer80, Glock-style handgun frames of which ATF has specifically, repeatedly, and expressly approved.

96.     **Fourth**, in August of 2018, ATF approved of a "SS80" subcompact, slimline Glock-style frame.[8]

97.     Plaintiff's inventory also includes this SS80, 80% frame.

98.     **Fifth**, November of 2017, Plaintiff received a favorable determination from ATF with respect to an 80% frame in the style of the Sig Sauer P320 handgun.  Exhibit "8."

99.     Plaintiff's inventory also includes this P320-style 80% frame.

100.     In sum, with respect to each of the "80% frames and receivers" that Plaintiff offers for sale, the ATF has issued at least one favorable classification letter finding that each such frame or receiver has *not* reached a sufficient stage of completion to be regulated and thus is *not* a firearm under the GCA.

101.     Aside from the Final Rule scheduled to take effect on August 24, 2022, which is still subject to legal challenge based on, *inter alia*, lack of statutory authority, both before and after

---

[8] https://www.glockstore.com/assets/images/email/SS80-ATF-Ltr.pdf

it becomes effective, ATF has never revoked or otherwise called into question the continued validity of these numerous classification letters.

### ATF Has Repeatedly Approved of "80% Frames and Receivers" Even When Combined with Jigs, Tools, and Firearm Parts

102.    In addition to its dozens of classification letters determining that many different types of "80% frames and receivers" are not firearms, ATF has also issued letters *approving of the combination of various unregulated items into a "kit" to be sold with the 80% frame or receiver.*

103.    On September 17, 2014, ATF issued a determination letter about an AR-15 type 80% receiver blank which included a "material removal guide, three drill bits, and an end mill." Exhibit "9." Earl Griffith, the then-Chief of ATF's Firearms Technology Branch (ATF's lead subject matter expert) determined that even this combination of an 80% receiver with *tools and other finishing devices* was *not* a "firearm frame or receiver" because it did not "incorporate indexing characteristics such as locating features for the hammer and trigger pins," and "is completely solid in the fire-control area."

104.    In August of 2006, ATF discussed an "incomplete 10/22 Magnum-type receiver." Exhibit "10." Strikingly, ATF opined that "your incomplete receiver was previously examined by this Branch and was classified as a non-firearm. ***Selling this item as a 'kit' with blueprints, parts, etc., will not change this classification***." *Id*. (emphasis added).

105.    Likewise, in November of 2011, ATF examined a "sheet-metal replacement [] receiver that has not reached a point in manufacturing to be considered a 'firearm' frame/receiver," and which was coupled with other parts as a "M44-type kit." Like its 2006 letter above, ATF concluded that even the "*kit*" was not a firearm under the GCA. Exhibit "11."

106.    Similarly, in a December 2013 presentation entitled "Identify AR and AK Type Receivers and Assorted Manufacturing Methods and Equipment," ATF explained that "[t]he

internet has expanded the availability of unfinished receivers, firearm parts, firearm parts kits, and the tools needed to assemble … complete and functional firearms … *none of the required materials are regulated*, [and] *all may be easily, affordably, and anonymously purchased via the internet*." Exhibit "12" at 52.  Elsewhere in the document, ATF stated that an "unfinished receiver" is "not a firearm," and "***[p]arts kits" that do not contain a finished "firearm receiver, are not regulated by any statute other than for importation.***"  *Id.* at 3, 28 (emphasis added).

107.    Additionally, an "ATF Intelligence Assessment Document," entitled "Increased Possession of Privately Made Firearms (PMFs) by Prohibited Persons" makes clear that none of the items sold by Plaintiff is regulated by federal law, explaining that "[i]ndividual components and receiver/frame-shaped components required to complete a PMF generally do not meet the definition of a firearm … ***[t]he individual components can be purchased as '80 percent kits'*** …." Exhibit "13" at 3.  This ATF document goes on to explain that "[t]he ATF Form 4473 … *is not required* for individual component parts or receiver/frame-shaped components that are not yet considered firearms."  *Id*. at 3-4.

108.    Finally, the U.S. Attorneys' Bulletin from November of 2015, entitled "Prosecuting Firearm Offenses," describes the process to make a homemade firearm, and explains that, along with an 80% receiver, a DIY gun owner "can order a lower receiver parts kit, an upper receiver, barrel, and other parts necessary to assemble a completed firearm that will expel a projectile by an explosive. *All of these accessories are readily available, and the purchaser will not be required to go through a background check* to self-complete a firearm. Additionally, the purchaser will not have been required to file an ATF Form 4473…."[9]  *Id*. at 48 (emphasis added).

109.    Each of these documents <u>directly contradicts</u> the position taken by ATF in its C&D

---

[9] https://www.justice.gov/usao/file/794586/download.

Order to Plaintiff – that unfinished "80% frames and receivers" (which ATF repeatedly has determined to be non-firearms), combined with common firearm parts (which ATF has explained it does not regulate) magically combine to become more than the sum of their parts as a regulated "firearm."

110.    On the contrary, zero plus zero does not equal one.

111.    In fact, as noted above, ATF has expressly and repeatedly approved of scenarios where unfinished "80% frames and receivers" are sold together with tools, finishing devices, instructions, blueprints, templates, and even all the "parts" necessary to complete a fully functional firearm.

112.    ATF's entirely new, unannounced, and legally unsupported policy change, set forth in its C&D Order to Plaintiff, is entirely undermined by ATF's existing letters and rulings – not to mention completely without statutory authority.

### ATF's Ever-Changing Position About 80% Frames and Receivers

113.    The ATF letters and guidance documents listed above document longstanding ATF policy when it comes to sale of firearm parts, "80% frames and receivers," and "parts kits" that contain combinations of both types of unregulated items.

114.    ATF has opined not only that each of the 80% receivers Plaintiff sells is not a firearm, but also has expressly approved of the sale of "kits" including not only such "frame or receiver" but also firearm "parts."

115.    Relying in good faith on the ATF's numerous and repeated rulings, classification decisions, and public representations, the firearms industry has manufactured and sold not only "80% frames and receivers," but also firearm parts and "kits," in order to permit law-abiding gun owners to purchase and then manufacture their own personal firearms, as has been legal since this Nation's founding, and as is protected by the Second Amendment.

116.    Then suddenly, without warning, in December of 2020 ATF paid a visit to the nation's largest manufacturer of "80% frames and receivers" – Polymer80, Inc..[10]

117.    Whether ATF chooses to characterize this visit as a "raid" or merely a "visit," federal agents armed with a search warrant arrived at the company's headquarters on December 10, 2020.

118.    The focus of ATF's search warrant was to affect the *seizure* of Polymer80's popular "Buy Build Shoot" Kits ("BBS Kit"), which ATF alleged "'contains all the necessary components' to build a complete firearm, including 'the 80% frame kit, complete slide assembly, complete frame parts kit, 10 round magazine and a pistol case.'" *Id*. at ¶7.

119.    With respect to Polymer80's sale of its BBS Kits, ATF's search warrant also alleged a cornucopia of at least 13 different types of federal crimes. *Id*. at ¶2.

120.    While at Polymer80, ATF agents seized all of the company's complete BBS Kits.

121.    However, ATF agents did not seize any other "80% frames or receivers," jigs, tools, or parts, even though Polymer80 manufactured, widely distributed, and made retail sales of "all the component parts" to manufacture a firearm, separately and aside from its BBS Kits.

122.    Had ATF in December 2020 been operating under the new theory announced in its C&D Order to Plaintiff, its agents certainly would have seized other purportedly illegal items as well, on the theory that Polymer80 was unlawfully transferring "all the components" to manufacture a firearm even though not packaged as complete "kits."

123.    Although ATF's Polymer80 warrant affidavit alleged that numerous federal felony crimes had been committed, and made a large seizure of BBS kits, to date it appears that no charges have been brought against Polymer80 in relation to its sale of BBS Kits or any other product.

---

[10] https://www.wsj.com/articles/ghost-gun-company-raided-by-federal-agents-11607670296.

124. Nor have ATF's dramatic policy shift and curious legal theories yet been tested in a court of law.

125. Rather, the agency has operated as though it had free reign to coerce compliance from the industry with its new policy through threats and intimidation, without judicial oversight.

126. On the same day that ATF executed its Polymer80 search warrant, its agents also paid a visit to online retailer Brownells.com.

127. ATF agents accused Brownells of also selling Polymer80 BBS Kits, and demanded they be permitted to seize any such kits.

128. Unfortunately for ATF, Brownells demonstrated that it did not sell BBS Kits, and ATF was sent away empty-handed.

129. However, Brownells *did* (and still does) sell "all the component parts"[11] for a person to manufacture a firearm – just not packaged together as a "kit."

130. Had ATF during its December 2020 visit to Brownells been operating under the new theory announced in its C&D Order to Plaintiff, agents would not have walked away empty handed.

131. ATF's C&D Order to plaintiff claims that "***ATF has held*** that kits which include all components necessary to produce a functional firearm, including the jig or template used to finish the unfinished frame or receiver, the slide assembly, and the necessary components to

---

[11] https://www.brownells.com/handgun-parts/slide-parts/slides/iron-sight-slide-for-glock-17-gen-3-prod109622.aspx
https://www.brownells.com/handgun-parts/slide-parts/parts-kits/slide-parts-kit-for-glock-9mm-prod123857.aspx?avs%7cManufacturer_1=POLYMER80
https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-textured-for-glock-19-23-32-prod97837.aspx?avs%7cManufacturer_1=POLYMER80
https://www.brownells.com/handgun-parts/frame-parts/parts-kits/frame-parts-kit-for-glock-gen-3-9mm-prod127127.aspx?avs%7cManufacturer_1=POLYMER80

complete the frame or receiver are themselves properly classified as 'firearms' under the GCA." Exhibit "1" at 1.

132.    On the contrary and in reality, ATF has never "held" this or anything like it.  Even if it had, the statute would not support such a conclusion.

133.    Aside from its seizures of BBS Kits, ATF did not issue a cease-and-desist letter to Polymer80, Brownells, or any other retailer that is known, during its December 2020 actions.

134.    Nor did ATF issue any "open letter" or "industry circular" to the firearm community.

135.    Nor did ATF make any public announcement or post anything on its website stating its new policy.

136.    In fact, ATF provided *absolutely no official public guidance whatsoever* as to its policy on "80% frames and receivers," or how manufacturers, retailers, and customers can comply with the agency's ever-changing, secret (and legally unsupported) policy.

137.    Instead, ATF has (seemingly deliberately) left the firearms community entirely in the dark about its policies on "80% frames and receivers," firearm parts, and "kits."

138.    Nevertheless, subsequent to ATF's December 2020 visits to Polymer80 and Brownells.com, members of the industry quickly began to comply with what was perceived to be ATF's new policy on "kits," and began to separate BBS Kits into component parts, so that they could not be accused of offering a complete "kit" for a person to manufacture a firearm.

139.    At present, it appears that virtually no companies offer complete "kits" to manufacture a firearm.

140.    Rather, if a customer wishes to purchase "all the component parts" to manufacture a firearm, he must purchase several different components, such as a slide, slide parts kit, frame,

and frame parts kit.

141.   Indeed, this modification of product offerings has become industry standard since December of 2020.

142.   This "voluntary" compliance by the industry seemed to satisfy the ATF as well. Since 2020, to Plaintiff's knowledge, the agency has not taken further action against the hundreds of online retailers who, just like Plaintiff, sell various parts and components which can be purchased and used by a customer to manufacture a privately made firearm.

**ATF's Legal Theories Are Without Merit**

143.   As explained above, the ATF C&D Order issued to Plaintiff is predicated on two separate legal theories with respect to Plaintiff's operations.  *First*, ATF claims that selling "*complete kits*" from which a firearm can be manufactured represents the transfer of an actual firearm.  *Second*, ATF claims that "selling and transferring *all the components* necessary to produce a fully functional firearm to a single customer in one or multiple transactions" represents the transfer of a firearm.  Exhibit "1" at 1 (emphasis added).

144.   As explained above, ATF's first claim, that the sale of "complete kits" constitutes the sale of a firearm, is a departure from the agency's long-standing policy, and was first enforced against Polymer80 in December of 2020.  To Plaintiff's knowledge, ATF's second claim, that companies must actively prohibit customers from purchasing "all the components necessary" to manufacture a firearm, is *entirely new and without precedent*.

145.   ATF's C&D Order does not elucidate as to the specifics of ATF's legal theory as to how an 80% receiver (which ATF and federal law both say is not a firearm) together with firearm parts (which ATF and federal both say are unregulated) together can become a regulated "firearm" However, ATF previously has advanced two legal theories, neither of which is persuasive.

146.   An Item Must Be a "Firearm" before it Can Be a "Handgun"

147.    First, in a February 2018 letter issued to Polymer80, ATF *refused to classify* a "full size" 80% handgun frame, even though the agency had just classified a *virtually-identical* "compact" size 80% handgun frame the prior year.  *Cf.* Exhibit "6" (*approving* of a Polymer80 "Glock-type 'GC9 Blank'" frame and Exhibit "7" (*approving* of a Polymer80 "PF940C" Glock-style 80% handgun frame) with Exhibit "14" (*refusing* to classify a Polymer80 "PF940V2" Glock-style 80% handgun frame).

148.    As justification for its 2018 refusal to classify Polymer80's newest product, ATF claimed that it "will not render a classification on a partial product submission," demanding that Polymer80 resubmit its 80% frame together with the other items that are shipped in the box, such as the milling jig, drill bits, and frame pins (tools which the hobbyist can use to manufacture a finished firearm frame from an "80% frame or receiver").  Exhibit "14" at 4.

149.    To plaintiff's knowledge, this was the first time that ATF refused to render a classification of an 80% frame or receiver on the theory that other unregulated tools (jig/mill, drill bits) did not accompany the product submission.

150.    What's more, prior ATF classification letters have approved of 80% receivers both *with* (Exhibit "9") *and without* (Exhibit "8") such tools, providing absolutely no indication that the inclusion of such items have any legal effect on the classification of an 80% frame or receiver.

151.    Indeed, ATF classification letters have specifically disclaimed any such argument, advised that adding additional parts to create a "kit … will not change th[e] classification" of an 80% frame or receiver.  Exhibit "10".

152.    As the basis for its 2018 refusal to classify Polymer80's product, ATF advanced the theory that a Polymer80 frame might be a "firearm" under 18 U.S.C. Section 921(a)(3) ***because*** it might be a "handgun" under 18 U.S.C. Section 921(a)(29).  Exhibit "14" at 4; *see also* Exhibit

"15" at ¶65.

153.    ATF's reasoning puts the cart before the horse.

154.    In fact, 18 U.S.C. Section 921(a)(29) expressly defines a "handgun" as either:

(A) *a firearm* which has a short stock and is designed to be held and fired by the use of a single hand; and

(B) any combination of parts from which *a firearm* described in subparagraph (A) can be assembled.[12]

155.    In other words, under either subsection of Section 921(a)(29), a "handgun" must first be "a firearm" under Section 921(a)(3) before it can be a "handgun" under Section 921(a)(29).

156.    An 80% receiver, even in "kit" combination with other parts, does not meet the definition of a "handgun" under Section (a)(29) because it is not already a "firearm" under Section 921(a)(3).

157.    Plaintiff is not aware that ATF has advanced this curious legal theory *either before or since* its refusal to classify a Polymer80 product in 2018, and the search warrant it served against Polymer80 in 2020.

158.    Strikingly, ATF Final Rule 2021R-05F does not even mention Section 921(a)(29) in this context, and does not make the claim that 80% receivers or what it terms "weapon parts kits" are "firearms" under Section 921(a)(3) *because* they are "handguns" under Section 921(a)(29).

159.    The omission of this curious legal theory from ATF's Final Rule would appear to

---

[12] Clearly, an unfinished 80% frame or receiver, even in the presence of other parts, is not capable of being "*assembled*" into a handgun until it is fully *manufactured* into a complete firearm "frame or receiver." Even ATF agrees. *See* P80 warrant at ¶12 ("The distinction between a finished and unfinished frame is that a finished frame is capable of receiving the components necessary to assemble it into an operable firearm.").

indicate that the agency has abandoned it, and rightfully so, because it is entirely without merit.

**A "Parts Kit" Does Not Turn an *Unfinished* 80% Frame or Receiver into A Firearm**

160.    Second, rather than rely on the argument that 80% "kits" are "handguns" under Section 921(a)(29) and *therefore* firearms under Section 921(a)(3), ATF in the Final Rule instead relies on an entirely different legal theory in order to classify 80% receivers and parts kits as firearms – namely, application of the term "readily" in Section 921(a)(3)(A).[13]

161.    Although ATF claims that the Final Rule is not the basis of its enforcement action against Plaintiff, the Final Rule describes what appears to be the *only other legal theory* that ATF has ever advanced as to why an unfinished and unregulated 80% receiver could possibly transform into a "firearm" through the inclusion of additional unregulated gun parts.

162.    Section 921(a)(3) defines "firearm," in pertinent part, as:

(A) any weapon (including a starter gun) which *will* or is *designed* to or may readily

---

[13] ATF has never used the concept of "readily" from Section 921(a)(3)(A) and the *amount of time* needed to finish an item into a firearm, when it comes to classifying unfinished 80% receivers. Rather, historically, ATF's classification letters for unfinished GCA firearms have focused on the *completeness of the product* – the *specific milling operations* that have been performed, as compared to milling operations that have not been performed.  *See* Exhibit "17" ("If you plan to sell a solid bar having the exterior profile of an MP40 submachinegun receiver and having no internal machining, the item would not be a firearm."); Exhibit "18" ("the interior cavity has not been completely machined"); Exhibit "19" ("block of metal … and (2) holes ... must be drilled out … the magazine opening and the receiver cavity are completely machined out…."). Even ATF's current existing website says that certain 80% receivers are not firearms because "the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the GCA." *See* https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal (using pictures to demonstrate what is not considered a "firearm" and at what stage it becomes a "firearm"). In other words, ATF's examinations of 80% receivers focused on subsection (B) of Section 921(a)(3) – whether an item is or is not "the frame or receiver of any such weapon" – rather than on subsection (A) – whether an 80% receiver or related parts kit "may readily be converted to expel a projectile." ATF's C&D Order to Plaintiff, and actions in the upcoming Final Rule 2021R-05F, thus represent a dramatic change in longstanding agency policy, without acknowledging the shift, much less providing a reasoned explanation for it.

be *converted* to expel a projectile by the action of an explosive; [or]

(B) the frame or receiver of any such weapon.  [Emphasis added.][14]

163.    In the Final Rule, ATF discusses that "[w]eapon *parts kits*, or aggregations of weapon parts, some of which contain *all of the components necessary to complete a functional weapon* within a short period of time, have been increasingly sold to individuals either directly from manufacturers of the kits or retailers…."  *Id*. at 24662.

164.    ATF's C&D Order to Plaintiff uses nearly identical language to the Final Rule, yet claims to have no connection to the Final Rule.

165.    The Final Rule claims that such "parts kits" or "aggregations of ... all of the components" are "parts kits that are *designed to or may readily be completed,[15] assembled, restored, or otherwise converted* to expel a projectile by the action of an explosive."  *Id*. at 24653.

166.    This language in the Final Rule loosely paraphrases Section 921(a)(3)'s language from the GCA ("will or is designed to or may readily be converted to"), cobbled together with language drawn from the National Firearms Act's definition of a "machinegun" ("shoots, is designed to shoot, or can be readily restored to shoot" and "combination of parts from which a machinegun can be assembled") and possibly even Section 921(a)(29)'s language about "handguns" ("any combination of parts from which a [handgun] can be assembled.").

167.    This linguistic concoction, compiled from several different sections of two entirely different Congressional enactments, discussing entirely different types of regulated "firearms," constitutes an expansive and improper revision of the statutory text in Section 921(a)(3)(A).

168.    Nevertheless, this appears to represent ATF's only legal theory as to how

---

[14] ATF's C&D Order to Plaintiff merely quotes both halves of Section 921(a)(3), but does not explain which section ATF believes Plaintiff's product fall under.
[15] The word "completed" appears in neither the GCA nor the NFA.

*unregulated* 80% receivers, in the presence of other *unregulated* firearm parts, somehow together constitute *regulated* "firearms" under federal law.

169.    In other words, the reasoning contained in the ATF Final Rule clearly is the basis for ATF's C&D Order to Plaintiff, even though the C&D Order denies it, and even though the Final Rule is not yet effective.

170.    There are at least three separate flaws with the agency's legal position.

171.    **First**, the term "readily" clearly applies to complete "weapons" in Section 921(a)(3)(A),[16] but has no application to the point at which an unfinished item becomes a finished "frame or receiver" under Section 921(a)(3)(B). *See Russello v United States*, 464 US 16, 23, 78 (1983) ("where Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *see also* A. Scalia and B. Garner, Reading Law, at 112 ("The omission of words from a statute must be considered intentional on the part of the legislature. Words may not be supplied in a statute where the statute is intelligible without the addition of the alleged omission. Words may not be inserted in a statutory provision under the guise of interpretation.").

172.    For a device to be capable of "readily be[ing] converted" into a firearm it must first be a "weapon."  Yet an unfinished 80% receiver – something that ATF acknowledges is merely a *precursor* to being a finished firearm frame or receiver – *is not a "weapon."*  First, it clearly is not an operational firearm that "will" fire ammunition.  Second, not even fully manufactured, and certainly not assembled or operable, such a device cannot fire *even blank* ammunition.  An 80%

---

[16] Adopted as part of the 1968 GCA, this language was "[a]dded to the term 'firearm' [to regulate] weapons which 'may readily be converted to' a firearm.  The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile…."  Exhibit "20."

receiver (or even a complete parts "kit") cannot be used as a "weapon" in any sense of the word (other than perhaps by throwing it at someone).  On the other hand, even a blank firing or starter gun can be used as a "weapon" through threats and intimidation.  Nor has an 80% receiver (even if sold as part of a kit with other parts) ever been deemed a "weapon" of any sort.

173.    **Second**, there is a more fundamental reason that an 80% receiver as part of a so-called "weapon parts kit" is not a "firearm" under Section 921(a)(3)(A).

174.    Under Section 921(a)(3)(A), in order to "complete[], restore[], assemble[], or otherwise convert[]" an 80% frame or receiver (plus a collection of parts) into a functioning "weapon," ***two steps*** must occur.  First, the 80% frame or receiver must be fully manufactured into a functioning frame or receiver governed by the statute.  Second, the functional "weapon" must be assembled using that frame or receiver.

175.    Yet under Section 921(a)(3)(B), there is only ***one step*** that must be taken to turn an item into a firearm "frame or receiver" – manufacture of the 80% frame or receiver into a functioning frame or receiver governed by the statute.

176.    In other words, an 80% frame or receiver becomes a Section 921(a)(3)(B) "frame or receiver" long before it ever becomes a Section 921(a)(3)(A) "weapon."

177.    Thus, the addition of parts, jigs, tools, *etc*. to an 80% frame or receiver has *no bearing* on when the item becomes a "firearm," as the kit will become a "frame or receiver" (and thus a firearm) long before they become a functional "weapon" (and thus a firearm).

178.    **Third**, a "weapon parts kit" contains an unfinished and unregulated 80% product, which ATF has determined is *not* a "frame or receiver" under federal law.  Yet in order to be a "weapon" described in Section 921(a)(3)(A), an object ***must contain a finished frame or receiver***.

179.    Indeed, Section 921(a)(3)(B) describes as a firearm "the frame or receiver *of any*

*such weapon*," clearly indicating that "any such weapon" under Section (A) *must contain* a "frame or receiver."

180.    Since ATF acknowledges that an 80% frame or receiver is ***not*** a frame or receiver covered by the statute, a kit that incorporates an 80% frame or receiver cannot possibly be a "weapon" under section (A).

181.    In short, there is no way for ATF to hammer the square peg of 80% "kits" into the round hole of Section 921(a)(3).  *St. Vincent Randolph Hosp., Inc. v. Price*, 869 F.3d 510, 513 (7th Cir. 2017) ("When the agency just asserts an *ipse dixit*, then the decision falls for the lack of a reason."); *see also Morrison v. Olson*, 487 U.S. 654, 726 (1988) (Scalia, J., dissenting) ("It is in fact comforting to witness the reality that he who lives by the *ipse dixit* dies by the *ipse dixit*.).

**ATF Is Enforcing Its Final Rule Against Plaintiff, Three Months Prior to its Effective Date**

182.    Even if one of ATF's flawed legal theories were to be adopted here, the C&D Order issued against Plaintiff contains another fundamental flaw – namely, that it represents ATF's attempt to enforce new policies from the Final Rule that are not scheduled to take effect until more than three months from now, on August 24, 2022.

183.    To be sure, the C&D Order makes the claim that ATF's position has been taken "notwithstanding the recently announced regulations and definitions under Final Rule 2021R-05F."  Exhibit "1" at 1.

184.    However, the C&D Order adopts the same (flawed) legal reasoning of, and actually uses identical language in, the Final Rule.  Thus, there is no reasonable way to understand ATF's action against Plaintiff other than as an attempt to implement the Final Rule before it takes effect.

185.    Moreover, when Plaintiff's counsel requested more information about the C&D Order from ATF, the agency's lawyers *specifically instructed* Plaintiff's counsel to examine the Final Rule in order to better understand ATF's position as announced in the C&D Order.  Exhibit

"2" at 3-4.

### Application of ATF's C&D Order *Only* to Plaintiff Constitutes Harassment

186.    Implementing a Final Rule not scheduled to take effect for more than three months, against only one of innumerable similarly situated businesses, constitutes selective, targeted enforcement, based on arbitrary and capricious decision-making.

187.    Indeed, there are dozens, if not hundreds (or possibly thousands) of other companies across the country and internet which offer for sale "all the component parts" necessary for a customer to manufacture a complete firearm.

188.    This raises the obvious question as to why ATF made the decision to target Plaintiff with a cease-and-desist order, effectively shutting down its business, for doing nothing more than following standard industry practice.

189.    If ATF had wanted to change (again) its secret, unsupported policy on 80% frames and receivers, the agency had the option of issuing an Open Letter to all manufacturers and retailers of 80% receivers and firearm parts, giving notice to all of the change.

190.    Indeed, ATF has a great deal of experience with drafting such Open Letters.  *See* https://www.atf.gov/rules-and-regulations/firearms-open-letters.

191.    On the other hand, forcing the shut-down of one company's business, under vague but implicit threat of criminal prosecution, no way to effect an industry-wide change based on a secret ATF policy.

192.    What is more, in addition to companies in the Second Amendment industry such as Plaintiff, which sell 80% unfinished frames and receivers along with firearm parts and tools, there are tens of thousands other companies and stores across the country that also sell "all components necessary" for a person to manufacture a firearm.

193.    For example, virtually any home supply or hardware store, big box retailer, or

online marketplace contains materials and components for sale which can be used or repurposed to manufacture a firearm, even without an "80% frame or receiver." *See, e.g.*, http://www.thehomegunsmith.com/pdf/BSP-SMG_Book.pdf (providing blueprints on how to build a "a 9mm submachine gun utilizing off the shelf 'British Standard Pipe' (BSP) Fittings," and "plumbing / hardware products and components which … are readily available from most good trade plumbing outlets.").

194.    Just as with the products Plaintiff sells, the items available at these ubiquitous retailers (pipes, fittings, rods, sheet metal, tubing, metal plate, nuts and bolts, etc.) are *not* firearms under federal law, and thus are entirely *unregulated* by ATF, and cannot be regulated by the agency absent an additional grant of statutory authority by Congress.

195.    And just as with the products Plaintiff sells, the items available at these retailers do not magically *become* a firearm on the theory that a person can walk through a store, put into his cart, and head to the checkout aisle with a "complete set of component parts necessary to create a firearm," which ATF says "need not be packaged or sold in a single container or a single transaction in order to be considered a firearm." *See* Exhibit "1" at 1.

196.    Yet in spite of the fact that Plaintiff's business is (from a legal perspective) no different than any of these other retailers, ATF does not seem to have issued a cease-and-desist order to any Home Depot, Lowes, Amazon, eBay, Walmart, or Target.

197.    Nor could ATF reasonably respond that these other products (raw materials such as metal, plastic, or wood, or ordinary household objects) are *obviously* not firearms, unlike ATF alleges Plaintiff's products to be.

198.    Indeed, when asked to classify a *metal water bottle* – along with a *piece of paper* theorizing how one *might* be able to turn that water bottle into a firearm – ATF responded that the

*metal water bottle* (by itself) *might actually be a firearm, or even a machinegun.*  Exhibit "16."

199.    That determination, reaching the shocking opinion that a common household object (with nothing else) *might be a firearm*, came from the top subject matter experts at the agency tasked with enforcing this nation's gun laws.

200.    No respect, and certainly no deference, is due to any legal theory, decision-making process, or subject matter "expert" opinion that provides such absurd results.

201.    On the contrary, none of the products (or combinations thereof) that Plaintiff sells is a firearm under federal law, a fact confirmed not only by numerous ATF classifications, letters, and opinions, but most importantly by the plain text of the statute.

202.    Accordingly, ATF's C&D Order to Plaintiff lacks statutory authority, and should be invalidated.

### Facts Relating to Emergency/Injunctive Relief

203.    Plaintiff is, primarily, a retailer of firearms parts and accessories which were left wholly unregulated by the Gun Control Act.

204.    Thus, Defendant ATF is entirely without authority to regulate any portion of Plaintiff's business.

205.    Yet on May 12, 2022, Plaintiff received a hand-delivered Cease and Desist Order from ATF, ordering Plaintiff to take certain actions in order to come into compliance with vague and unclear demands by the agency.

206.    Due to the vague and ambiguous nature of ATF's C&D Order to Plaintiff, shortly after receiving that letter Plaintiff was forced to stop retail sales, shutter its website and cancel all outstanding orders, in order to ensure full compliance with ATF's demands.

207.    ATF's C&D Order to Plaintiff thus has caused great financial harm, amounting to tens of thousands of dollars of sales, every day that Plaintiff remains shut down.

208.    As of May 11, 2022, JSD Supply employed more than a dozen individuals, each of whom has a family to support and who relies on the income provided by Plaintiff's business operations.

209.    Without a source of revenue, Plaintiff soon will not be able to retain these employees.

210.    Without a source of revenue or the ability to sell any of its products, Plaintiff soon will not be able to continue to exist as a company.

211.    In addition to the direct financial harm caused by ATF's C&D Order, Plaintiff is also losing unquantifiable amounts of goodwill with its customer base as a direct result of compliance with ATF's vague demands, having had to cancel pending orders, and halt new orders to customers who wish to purchase Plaintiff's products.

212.    Plaintiff cannot reasonably interpret how far ATF's vague C&D Order goes in attempting to regulate vague concepts such as "kits" or various "sets" of component parts regardless of whether "packaged or sold in a single container or a single transaction,"

213.    Even after ATF promised to address "any questions" Plaintiff had, and even after Plaintiff sought such promised clarification from the ATF (hoping to resume business operations on at least a limited basis), ATF was unwilling to answer simple, straightforward questions and refused to provide any clarity at all as to what products Plaintiff is "allowed" to sell to its customers.

214.    As a result, Plaintiff, through counsel, sent the ATF a formal letter on May 13, 2022, seeking clarification as to *specific* questions regarding compliance, and seeking a response by May 18, 2022.  Exhibit "2."

215.    As of the date of this Complaint, ATF has neither provided any substantive

response to that letter, nor has answered the specific questions posed by Plaintiff.

216.    Defendants, having refused to provide meaningful guidance as to how to comply with their vague demands, left Plaintiff with no realistic option other than to file this action, as Plaintiff is not able to remain in operation with ATF's Sword of Damocles dangling overhead, notwithstanding that Plaintiff has not violated any federal law or regulation.

217.    Plaintiff thus asks the Court to direct ATF to operate within the jurisdiction of the statutes written by Congress, rather than by new and secret policies created at will, all the while refusing to provide guidance to the industry – and in particular Plaintiff – on how to comply with those secret standards.

### FIRST CAUSE OF ACTION
### (VIOLATION OF APA 5 U.S.C. § 706(2)(A))
### ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION,
### NOT IN ACCORDANCE WITH LAW

218.    Plaintiff realleges the above paragraphs as though fully set forth herein.

219.    ATF's challenged C&D Order to Plaintiff constitutes "agency action" pursuant to 5 U.S.C. § 551(13) for purposes of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

220.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A).

221.    A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.

222.    An agency's departure from prior practice can serve as an additional basis for finding an agency's action to be arbitrary and capricious.  In this case, Defendants have dispensed with countless determinations and classifications that are contrary to the agency's position

announced in the C&D Order, without acknowledging the change, much less providing a reasoned explanation for the agency's tectonic policy shift.

223.    It is undisputed that federal law does not regulate firearms parts, yet Defendants' actions against Plaintiff constitute an attempt to do just that, returning the state of the law to the *repealed and replaced* Federal Firearms Act of 1938.

224.    ATF's C&D Order also represents an advance attempt to enforce an agency Final Rule which is not scheduled to take effect for more than three months.

**SECOND CAUSE OF ACTION**
**(VIOLATION OF APA 5 U.S.C. § 706(2)(C))**
**IN EXCESS OF STATUTORY JURISDICTION OR AUTHORITY**

225.    Plaintiff realleges the above paragraphs as though fully set forth herein.

226.    Under the APA, a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

227.    Attempts by an agency to regulate and control the sale of items that federal law does not regulate violates the APA.

228.    The ATF C&D Order challenged in this case was issued in an attempt to assert the agency's control over an area of commerce that federal law clearly and unambiguously does not regulate.   Indeed,  no  federal  law  gives  Defendants  the  authority  to  regulate  the  domestic manufacture, sale, or transfer of unfinished 80% frames and receivers (non-firearms), related tools and finishing devices, or non-receiver firearm parts used to complete them.

229.    Defendants' C&D Order to Plaintiff thus is *ultra vires*, in excess of ATF's statutory jurisdiction or authority, as federal law does not give the ATF any authority to regulate Plaintiff's business or the items it sells.

230.    Defendants may only exercise the authority conferred to them by statute.  Neither

the NFA nor the GCA confer upon Defendants the power to rewrite the statute or promulgate a rule in open defiance of statutory text, and certainly does not give the agency power to revive a federal law long since repealed, namely the Federal Firearms Act of 1938.

**THIRD CAUSE OF ACTION**
**(VIOLATION OF SECOND AMENDMENT)**
**RIGHT TO KEEP AND BEAR ARMS**

231.    Plaintiff realleges the above paragraphs as though fully set forth herein.

232.    The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

233.    To be sure, federal courts generally have sanctioned (rightly or wrongly) "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570 (2008).

234.    But in this case, Congress has explicitly *not* chosen to regulate the manufacture, distribution, or sale of firearm parts, or unfinished 80% frames and receivers, which are (at best) unregulated precursors to components regulated by the GCA.

235.    Indeed, whereas the Federal Firearms Act of 1938 explicitly regulated "any part or parts" of a firearm, Congress found such regulation "impractical" and decided to eliminate regulation of firearm parts with passage of the Gun Control Act of 1968.

236.    Defendant's attempts to regulate by administrative fiat that which Congress has explicitly determined should be left unregulated violates the Second Amendment right to keep and bear arms.

237.    The U.S. Supreme Court has recognized that the Second Amendment protects each individual citizen's right to keep and bear arms. *See District of Columbia v. Heller*, 554 U.S. 570 (2008).

238.    In order to engage in the constitutionally protected activities of "keeping" and

"bearing" firearms, weapons first must be acquired.

239.   It is thus beyond serious debate that the Second Amendment protects the right of individuals to make their own privately made firearms, and thus to acquire the parts and materials with which to do so. Likewise, the Constitution protects the corresponding right to sell firearm components, magazines, ammunition, and accessories, just as the freedoms of speech and press protect the right to buy and sell newspapers, books, paper, and ink.  Indeed, it would not mean much if there was a right to make a firearm, but no ability to purchase the materials necessary to do so.

240.   It is beyond reasonable debate that lawful firearm ownership necessarily includes the ability to acquire arms.  Other courts have recognized the connection between the right to keep and bear arms, and the ability to commercially purchase and sell weapons.  *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use[.]"); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."); *Andrews v. State, 50 Tenn*. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair."); *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (Second amendment preserves "a corresponding right to obtain' the 'necessary' arms and ammunition[.]"); *Elhert v. Settle*, CL20000582, 2020 Va. Cir. LEXIS 119, *7 (July 14, 2020) ("The lack of a right to buy *and sell* arms would negate the right to keep arms as well as defeat the purpose of the right stated in the prefatory clause....") (emphasis added).

241.   Defendants' C&D Order to Plaintiff, having been issued completely outside any

authority granted ATF by Congress under any statute, infringes the Second Amendment right to keep and bear arms.

## FOURTH CAUSE OF ACTION
## (VIOLATION OF FIFTH AMENDMENT)
## DUE PROCESS VAGUENESS

242.    Plaintiff realleges the above paragraphs as though fully set forth herein.

243.    The Fifth Amendment prohibits the deprivation of property without the due process of law. U.S. Const. Amend. V.

244.    Plaintiff has a property right in the continued running of its business, and Defendants are prohibited from depriving Plaintiff of that property absent due process of law.

245.    The fundamental requirement of procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 US 319 (1976).

246.    Plaintiff's procedural due process rights were violated when Defendants caused the C&D Order to be delivered to Plaintiff, making demands without any statutory authority or right, with respect to wholly unregulated products – and without an ability for Plaintiff to challenge the C&D Order before it was imposed on the business.

247.    Then, instead of providing the Plaintiff the promised answers to its questions (*see* Exhibit "1" at 2), ATF refused to clarify what Plaintiff could lawfully do (Exhibit "2" at 3), even though ATF has no authority to regulate a lawful business that only sells firearm parts.[17]

248.    Also implicit in the Due Process Clause is the principle that the law (including the law as announced by an administrative agency in a cease-and-desist order) must be clear so that

---

[17] *See Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) ("a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.").  "Moreover, it requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'" *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974).

ordinary persons may understand it.

249. As the Supreme Court has held, "the prohibition of vagueness in criminal statutes…is 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law.'" *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018).

250. In this case, ATF has injected ambiguity into an otherwise unambiguous statute, presumably in order to provide some cover for its arbitrary action declaring items unregulated by the GCA to be subject to the agency's regulatory powers, and then to order a company that sells those unregulated products to stop selling various unspecified objects, under vague threat of criminal prosecution.

251. Further, as the Second Circuit has held, such *ultra vires* conduct violates Due Process principles. *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 779 (2d Cir. 2007).

252. If a government agency does "not have authority for the actions it took" then those actions are "ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation." *Id*.

253. As established above, the Defendants' action exceeds the scope of their statutory authority and thus violate Plaintiff's procedural and substantive due process rights.

## FIFTH CAUSE OF ACTION
## (DECLARATORY JUDGMENT)

254. Plaintiff realleges the above paragraphs as though fully set forth herein

255. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a).

256. Absent a declaratory judgment, there is a substantial likelihood that Plaintiff will

additionally suffer irreparable injury in the future.

257.    There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

258.    This Court possesses an independent basis for jurisdiction over the parties.

259.    A judgment declaring that Defendants' actions (1) violates the statute, (2) violates the Second Amendment and the Fifth Amendment, (3) seeks to unlawfully apply the Final Rule in advance of its effective date, and (4) seeks to impose an arbitrary regulatory and enforcement authority over Plaintiff's business, will serve a useful purpose in clarifying and settling the legal relations at issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

260.    Plaintiff is therefore entitled to a declaration declaring Defendants' customs, policies, and practices void and unenforceable.

### Prayer for Relief

WHEREFORE, Plaintiff requests that the Court grant all appropriate relief, including:

a.  The issuance of a temporary restraining order, enjoining Defendants from enforcing, pursuing, or otherwise taking any action against Plaintiff with respect to ATF's C&D Order of May 9, 2022;

b.  The issuance of a preliminary injunction, enjoining Defendants from enforcing against Plaintiff the demands made in ATF's May 9, 2022 C&D Order to Plaintiff, or from taking any other action against Plaintiff as a result of that letter;

c.  A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202) or other applicable law, that:

    1.  holds unlawful and sets aside Defendants' C&D Order, finding it to be null, void, and unenforceable, contrary to law and in excess of the agency's statutory

authority;

2. declares that firearm parts are not regulated by federal law and outside ATF's authority to control;

3. declares that Plaintiff may continue to sell unregulated firearm parts *other than* 80% unfinished frames and receivers without violating federal law; and

4. declares that Plaintiff may continue to sell unregulated firearm parts along side or *together with* unregulated 80% unfinished frames or receivers and the unregulated tools or parts needed to complete them, in any amount or combination thereof, without violating federal law;

d. An order permanently enjoining Defendants from enforcing against Plaintiff the claims and demands made in ATF's C&D Order of May 9, 2022, and permanently enjoining Defendants from enforcing the Final Rule (2021R-05F) ahead of its date of implementation of August 24, 2022;

e. An award of attorneys' fees and costs to Plaintiff pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), 42 U.S.C. § 1988, and any other applicable statute or authority; and

f. Any other relief that this Court in its discretion deems just and proper.

Dated:  May 18, 2022                    Respectfully submitted,

By:   s/ David J. Berardinelli

David J. Berardinelli (Pa. ID No. 79402)
DEFOREST KOSCELNIK & BERARDINELLI
436 Seventh Ave., 30th Fl.
Pittsburgh, PA  15219
T:      412-227-3100
F:      412-227-3130
Email: berardinelli@deforestlawfirm.com

Robert J. Olson*
WILLIAM J. OLSON, P.C.
370 Maple Avenue West, Suite 4
Vienna, VA 22180-5615
T:      703-356-5070
T:      540-450-8777
F:      703-356-5085
Email: wjo@mindspring.com
*Admission pro hac vice pending

Stephen D. Stamboulieh* (MS ID No. 102784)
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS  38654
T:      601-852-3440
Email: stephen@sdslaw.us
*Admission pro hac vice pending

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NOT AN LLC d/b/a/ JSD SUPPLY, | ) | |
| | ) | Case No._____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES; UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE; and | ) | |
| GARY M. RESTAINO AS THE ACTING | ) | |
| DIRECTOR OF ATF, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**<u>VERIFICATION</u>**

Pursuant to 28 U.S.C. §1746, I, Jordan Vinroe, am the owner of Not An LLC d/b/a JSD

Supply in the above-captioned matter.  I declare that I have read the Verified Complaint in the

above-captioned matter.  I verify that the averments of fact contained therein are true and correct

to the best of my personal knowledge or information and belief where indicated.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 19, 2022 in Prospect, Pennsylvania.

_____
Jordan Vinroe, on behalf of Not an LLC d/b/a
JSD Supply, Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NOT AN LLC d/b/a/ JSD SUPPLY, | Case No._____ |
| Plaintiff, | |
| v. | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; and GARY M. RESTAINO AS THE ACTING DIRECTOR OF ATF, | |
| Defendants. | |

**<u>CERTIFICATE OF SERVICE</u>**

I declare under penalty of perjury that a copy of Plaintiff Not An LLC d/b/a JSD Supply's Verified Complaint for Declaratory and Injunctive was served today via First Class Mail postage prepaid and electronic mail to:

Daniel Riess (TX Bar #24037359)
Trial Attorney
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, D.C. 200005
Phone: 202-353-3098
Fax: 202-616-8460
Email: Daniel.Riess@usdoj.gov

Matthew P. Varisco
Special Agent in Charge
Philadelphia Field Division, ATF
601 Walnut Street, Suite 1000E
Philadelphia, PA 19106
Phone: 215-446-7800
Email: PhilDiv@atf.gov

Date: May 18, 2022                     _s/ David J. Berardinelli_____
                                                      David J. Berardinelli