**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
PITTSBURGH DIVISION

| | |
|---|---|
| JANE DOE, | |
| Plaintiff, | |
| | Civil Action No. _____ |
| v. | |
| PINE-RICHLAND SCHOOL DISTRICT, | |
| Defendant. | |

## COMPLAINT AND JURY DEMAND

Plaintiff, Jane Doe, by and through her attorneys, brings this action against Defendant Pine-Richland School District ("PRSD" or the "District") for Defendant's violations of her federal civil rights under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.*, violations of her federal civil rights under Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. 2000d *et seq.*, violations of her rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution and federal rights under Title IX, pursuant to 42 U.S.C. § 1983, and violation of Pennsylvania state law. Plaintiff states and alleges as follows:

### INTRODUCTION

1. During the 2017–2018 academic year, Plaintiff Jane Doe was a ninth-grade student in the District, which is comprised almost entirely of white students and white staff. Ms. Doe was born in Guatemala, is of Mayan descent, and has a dark complexion. Ms. Doe attended Pine-Richland High School ("PRHS") and had an Individualized Education Plan ("IEP"). Over the course of approximately six months during her first year of high school, Ms. Doe was

1

subjected to daily sexual harassment in the majority of her classes and extracurricular activities, by a male student ("Student 1") who repeatedly mimicked masturbation, described how "big" he was, and told Ms. Doe that he knew she "wanted it."  During that same period, Ms. Doe also suffered continuous racial harassment from a different male student ("Student 2") that included, but was not limited to, being called the N-word and told to kill herself hundreds of times.  As a result, Ms. Doe's grades plummeted, she was unable to focus on her schoolwork, suffered symptoms of severe depression and anxiety, and begged her parents to let her leave school.

2.       In April 2018, Ms. Doe courageously reported the sexual and racial harassment to the District.  She even showed a school administrator a video that captured Student 2 holding up his fist and saying to Ms. Doe "white power!" and "hang n*****s!"  Just prior to the beginning of the 2018–2019 academic year, Ms. Doe and her parents requested that PRHS take precautions to ensure Ms. Doe's safety.  But the District took no meaningful steps to hold the perpetrators responsible or prevent further harassment against Ms. Doe at school.  No investigation occurred, nor did the District inform the Doe family of any consequences or punishments issued to the perpetrators.  Instead, the Principal of PRHS outrageously contended that the vile racist words directed at Ms. Doe were "protected speech," ignoring that they in fact constitute hate speech intended to incite violence against Ms. Doe, and instructed Ms. Doe to surround herself with trusted friends at school to protect herself from continuing harassment.

3.       The District's determined indifference left Ms. Doe to fend for herself at school, rendered her vulnerable to further harassment, and emboldened other students, who knew they would face no consequences for harassing her.  Tragically, on January 7, 2019, the harassment against Ms. Doe escalated and culminated in another male student ("Student 3") brutally raping her during the school day in an on-campus bathroom.  Student 3, who a few months earlier had

been reported to PRSD for sexually harassing a female elementary school student, secluded Ms. Doe in a school restroom where, ignoring her pleas to stop and physical resistance, he restrained her, vaginally raped her with his penis, finger, and tongue, forced her to perform oral sex, and attempted to anally rape her.  Ms. Doe was finally able to escape, and she reported Student 3's sexual violence to a close friend, the District, law enforcement, and medical professionals that very same day.

4.      But Ms. Doe's predictable and preventable assault was not the end of her suffering.  Even after receiving a report of a violent rape committed on campus during school hours, the District refused to conduct its own investigation of the rape, make any independent determination as to whether Student 3 sexually harassed Ms. Doe, institute disciplinary consequences against him, or protect Ms. Doe from Student 3 at school and remedy the hostile environment she faced.  PRSD instead tried to force Ms. Doe to transfer out of PRHS to an alternative high school, while it permitted Student 3 to attend PRHS, prioritizing his education over that of Ms. Doe.  As a direct result of Defendant's failure to comply with its Title IX obligations and deliberate indifference to Ms. Doe's reports of sexual harassment and assault, Ms. Doe was left with no other choice than to attempt to continue her education from the safety of her home in order to escape the hostile and discriminatory educational environment.  Ms. Doe finished the last two and a half years of her high school education at home, without the benefits of in-person learning, live interaction with her classmates and teachers, or the extracurricular activities she loved so much, including band, softball, and Junior Reserve Officers Training Corps.

5.      Defendant's clearly unreasonable response to Student 3's sexual misconduct against Ms. Doe is likely due to—but in no way excused by—the District's lack of sexual

harassment policies and training regarding preventing, recognizing, investigating, and responding to student-on-student sexual harassment.

6.      Ms. Doe seeks recovery for the significant damages she has suffered as a result of the District's violations of her rights under Title IX and Title VI, violations of her right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution, and federal rights under Title IX, pursuant to 42 U.S.C. § 1983; as well as the District's negligence.

## JURISDICTION

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this litigation involves matters of federal law, specifically claims made under Title IX of the 1972 Education Amendments, 20 U.S.C. § 1681 *et seq.*, Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*, and claims for deprivation of federal and Constitutional rights under 42 U.S.C. § 1983.

8.      This Court also has subject matter jurisdiction over this litigation pursuant to 28 U.S.C. § 1343(a)(3)–(4) because this litigation involves claims for deprivation of Jane Doe's civil rights under 42 U.S.C. § 1983.

9.      The Court has supplemental jurisdiction over the state-law claims alleged herein pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy stemming from the allegations that form the basis of the federal claims in this action.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant Pine-Richland School District is located within this Judicial District and a substantial part of the events and omissions giving rise to the Complaint occurred in this Judicial District.

11.     This Complaint is timely filed because it is filed within two years of Plaintiff Jane Doe reaching the age of majority.

**PARTIES**

12.     Plaintiff Jane Doe is a resident of Allegheny County, Pennsylvania.[1]  Ms. Doe is currently over the age of majority, but the events underlying this Complaint occurred when Ms. Doe was a student, and many of them when she was a minor, at PRHS.

13.     Defendant Pine-Richland School District is a public school district serving students in Township of Pine and Richland Township, located within Allegheny County, Pennsylvania.  The District is a recipient of federal funds within the meaning of 20 U.S.C. § 1681, *et seq.*  The District is comprised of four elementary schools, Pine-Richland Middle School, and PRHS.  The Pine-Richland School Board oversees the District and is responsible for planning, setting policies, and evaluating results within PRSD.  The School Board consists of nine members who elect the Superintendent of Schools to supervise the administration of the District.

**FACTUAL BACKGROUND**

14.     Ms. Doe is the adopted daughter of Mr. and Mrs. Doe.  She was adopted from Guatemala when she was an infant, is of Mayan descent, and has a dark complexion.

15.     Upon information and belief, the racial makeup of PRSD students is approximately 87% white, with only 2% Hispanic/Latinx students; PRSD staff and administrators are approximately 98% white.

16.     Ms. Doe has attended Pine-Richland schools since she was in kindergarten.

17.     Ms. Doe began attending PRHS in Fall 2017, when she started the ninth grade.

---

[1]  Ms. Doe intends to file a Motion for Leave to Proceed Under Pseudonym to protect her identity as a minor sexual assault victim in conjunction with her Complaint.

18.     Ms. Doe had an IEP while she was a student at PRHS for Attention Deficit/Hyperactivity Disorder ("ADHD") and Other Health Impairment ("OHI").

19.     Although Ms. Doe had an IEP since the fourth grade, she had always successfully attended Pine-Richland Schools and had never had any disciplinary problems or recommendations that she needed an alternative education placement.

20.     In ninth grade, Ms. Doe was an involved student and an active member of the softball team.

21.     Ms. Doe also enjoyed participating in band, where she played the flute.

22.     In addition, Ms. Doe actively participated in Junior Reserve Officers' Training Corps ("JROTC"), which quickly became one of her favorite classes.  As a cadet in the JROTC program, Ms. Doe felt a sense of belonging and like she was part of a team.  As part of JROTC, Ms. Doe participated in drill team, played volleyball, and took part in community service activities.

### Almost Immediately After Entering Ninth Grade at PRHS, Ms. Doe Was the Victim of Sexual Harassment & Racial  Harassment

23.     During the 2017–2018 academic year, when Ms. Doe was in ninth grade at PRHS, she was sexually harassed by Student 1 nearly every day, typically several times a day, beginning in November 2017 and lasting until April 2018.

24.     Throughout that nearly six-month period, Student 1's harassment was inescapable because he and Ms. Doe shared five academic classes together, as well as band, JROTC, lunch, and learning support.

25.     Student 1's harassment of Ms. Doe occurred most often during class, typically when the lights were dimmed or the teacher was focused on something else and not watching the

students.  On these occasions, Student 1 would place a phallic-shaped object, such as a ruler or water bottle, over his crotch and mimic masturbation at Ms. Doe.

26.     Student 1 repeatedly made comments about how "big" he was and how much Ms. Doe "wants it."

27.     Ms. Doe felt threatened and scared by the daily harassment, and whenever Student 1 was present in the classroom she was unable to focus on learning or her classwork.

28.     Ms. Doe was terrified that, given the opportunity, Student 1 would follow through with his threatening behavior and physically assault her.

29.     As a result of the constant harassment, Ms. Doe's grades plummeted and she talked to her parents about leaving school rather than face three additional years with the same student harassing her.

30.     During that same time, Ms. Doe was also the victim of race and national origin discrimination by Student 2.

31.     Over the course of Ms. Doe's ninth-grade year, Student 2 repeatedly called Ms. Doe the N-word and told her to "go hang yourself."

32.     Student 2 harassed Ms. Doe hundreds of times with racial slurs and statements that she should kill herself between September 2017 and April 2018.

33.     By the third quarter of her ninth-grade year, Ms. Doe was failing most of her classes as a direct result of the ongoing sexual and racial harassment.

### *When Ms. Doe Finally Summoned the Courage to Report the Harassment She Had Endured, PRSD Responded with Deliberate Indifference*

34.     In early April 2018, Ms. Doe verbally reported the sexual and racial harassment to her parents and a trusted teacher.

35.     The District had no Title IX or sexual harassment policy or procedure.

36.     On April 9, 2018, Mr. and Mrs. Doe helped Ms. Doe file a complaint with PRHS about the sexual harassment.

37.     Ms. Doe and her parents submitted that written complaint to PRHS Principal Nancy Bowman, including identifying in writing a witness to the harassment and stating that Ms. Doe could identify many more witnesses upon request.

38.     On April 11, 2018, Ms. Doe and her mother met with then-Assistant Principal Laura Burns to discuss Ms. Doe's report of sexual harassment.

39.     Neither Assistant Principal Burns nor anyone else from the District informed Ms. Doe or her parents about Title IX or Ms. Doe's Title IX rights, or identified the District's Title IX Coordinator, if any such person existed.

40.     During the April 11th meeting, Ms. Doe verbally reported the persistent racial harassment to Assistant Principal Burns and showed her a video of Student 2 holding up his fist and saying to Ms. Doe "white power!" and "hang n*****s!" as an example of the type of harassment she endured.

41.     In late April 2018, Ms. Doe and her parents were notified verbally by phone that the school completed its "investigation" into Ms. Doe's reports.

42.     Ms. Doe and her family were never informed of what the investigation entailed, the outcome of the investigation, or resulting disciplinary action, if any, taken against Student 1 or Student 2.

43.     Ms. Doe was never asked for the names of the additional witnesses she had offered to provide as part of her report of sexual harassment.

44.     When the new school year began, Student 1 was in band class with Ms. Doe.

45.     As a result of the District's continued indifference to Ms. Doe's reports of sexually harassment, shortly after the school year began Ms. Doe quit the school band because of the hostile environment created by Student 1's continued presence.

### Ms. Doe Renewed Her Reports of Racial & Sexual Harassment at the Start of Her Tenth-Grade Year & the District Continued to Respond with Deliberate Indifference

46.     During the 2018–2019 school year, Ms. Doe was 16 years old and in the tenth grade at PRHS.

47.     Just prior to the start of the new school year in August 2018, Ms. Doe and her parents met with Principal Bowman to discuss how to protect Ms. Doe from the ongoing harassment.

48.     Knowing that Ms. Doe had reported ongoing sexual harassment at school, Principal Bowman nonetheless failed to inform Ms. Doe or her parents about Title IX or Ms. Doe's Title IX rights, or identify the District's Title IX Coordinator, if any such person existed.

49.     During that meeting, Ms. Doe reiterated her report about the many months of racial harassment she had suffered to Principal Bowman, who claimed she was previously unaware of Ms. Doe's report.

50.      Ms. Doe showed Principal Bowman the same video of the harassment depicting Student 2 holding up his fist and saying to Ms. Doe "white power!" and "hang n*****s!" as an example of the nature of the harassment she endured.

51.     In response to Ms. Doe's report, Principal Bowman told the Doe family that the persistent racial harassment constituted "protected free speech" and the school could not take any action.

9

52. Principal Bowman refused to institute any meaningful measure to ensure Ms. Doe's safety at school and, instead, advised Ms. Doe to surround herself with trusted friends to protect herself from the perpetrator.

53. Finally, Principal Bowman told Ms. Doe that she knew how Ms. Doe felt because she had a biracial nephew.

### *Ms. Doe Met Student 3 at the Start of Her Tenth-Grade Year*

54. During the 2018–2019 academic school year, Student 3 was a male student in the ninth grade at PRHS.

55. Prior to January 2019, Ms. Doe and Student 3 were casual friends and intermittently saw one another around campus.

56. Like Ms. Doe and Student 1, Student 3 was a cadet in the JROTC program.

57. Ms. Doe and Student 3 had never spent time together outside of school or school events, but occasionally messaged each other via Snapchat.

58. Upon information and belief, in September 2018, PRSD received a credible report that Student 3, who was in ninth grade, sexually harassed a female elementary school student by sexually propositioning her via text message.

59. Upon information and belief, PRSD did not investigate the report of Student 3's sexual misconduct, impose any disciplinary measures related to that harassment, or do anything to prevent him from engaging in sexual misconduct against other students.

### *Student 3 Sexually Assaulted Ms. Doe on January 7, 2019*
### *in a Locked Bathroom During the School Day*

60. On the morning of January 7, 2019, Student 3 went to see Ms. Doe at her locker, and he asked Ms. Doe if she would meet him in a private place for a "quick kiss" in the afternoon.

61.     Ms. Doe was hesitant about Student 3's request and did not answer him right away.

62.     A couple of hours passed, and when Ms. Doe saw Student 3 as he was going to lunch and she was heading to JROTC, she agreed to his request to meet later.

63.     During Ms. Doe's lunch period, she received a Snapchat from Student 3 suggesting that they have their quick kiss later that afternoon in the unisex bathroom by the home economics classroom.  Ms. Doe agreed.

64.     At the end of her lunch period, Ms. Doe and Student 3 met in the hallway and walked to the unisex bathroom.

65.     As soon as Ms. Doe and Student 3 entered the unisex bathroom, Student 3 locked the door.  The two kissed for a few minutes until Ms. Doe told Student 3 that she wanted to go to the library for study hall.

66.     Student 3 refused and told Ms. Doe, "No. Five more minutes," and continued to kiss her more aggressively.

67.     Shortly thereafter, Ms. Doe told Student 3 again that she wanted to leave, and he repeated "five more minutes."

68.     Ms. Doe was becoming increasingly upset and feared for her safety as her repeated wishes to leave the bathroom were denied.

69.     When Ms. Doe attempted to escape the bathroom, Student 3 physically assaulted and restrained Ms. Doe and, among other things, forcibly penetrated her vagina with his penis, digitally and orally penetrated her vagina, forced her to perform oral sex on him, and attempted to anally rape her.

70.     Student 3 continued to ignore that Ms. Doe was crying and begging him to stop.

71.     When she was finally able to escape Student 3's restraint, Ms. Doe pulled up her pants, grabbed her backpack, and ran out the door, traumatized, terrified, and in complete shock.

### *Ms. Doe & Her Parents Promptly Reported*
### *the Assault to the School District & the Police*

72.     As soon as she escaped the bathroom and Student 3, Ms. Doe called A.M., her best friend, distraught and terrified, and said she needed to talk to her.

73.     Ms. Doe was initially scared to tell an adult what had happened, fearing that she or Student 3 might get in trouble.

74.     In addition to the severe emotional and psychological distress, Ms. Doe was also in physical pain from the assault.

75.     After talking to A.M., who was upset at Ms. Doe's disclosure and encouraged her to report what Student 3 had done, Ms. Doe decided to tell a trusted adult.

76.     A.M. took Ms. Doe to see Chief Michael Gasparetto, an Air Force JROTC Instructor at PRHS that Ms. Doe trusted.

77.     When Ms. Doe disclosed to Chief Gasparetto what had just happened, he reacted angrily, scolded Ms. Doe for causing trouble and upsetting her friend, and told her she would have to talk to a guidance counselor and the police, admonishing her that she better give exactly the same description of what happened when she did because otherwise no one would believe her.

78.     Chief Gasparetto walked Ms. Doe to the guidance counselors' office, and a woman in the office instructed Ms. Doe to write down what had happened as Chief Gasparetto stood over her watching.

79.     Ms. Doe called her mother on the phone and began describing what had happened.  Mrs. Doe told Ms. Doe that she was coming to the school right away.

80. Mrs. Doe called Mr. Doe immediately to tell him to go to the school.

81. When Mrs. Doe arrived at PRHS, she was immediately escorted to Principal Bowman's office.

82. Principal Bowman asked Mrs. Doe if she knew what happened and Mrs. Doe responded that she did not know the details, but knew that something had happened in the bathroom involving a kiss and Ms. Doe could not get Student 3 to stop. Mr. Doe arrived shortly thereafter.

83. Principal Bowman informed Mrs. Doe that Ms. Doe had been taken to the guidance office and was writing a statement, but that school staff would get Ms. Doe and tell her to stop writing and come meet her parents.

84. Shortly after, staff in the guidance counselors' office instructed Ms. Doe to stop writing her statement and report to the principal's office to meet her parents.

85. Ms. Doe stopped writing mid-sentence and never finished writing her statement about what had happened. As a result, Ms. Doe's initial written statement was very short and only described the beginning of the horrific assault.

86. No one from PRHS informed Ms. Doe's parents what she had written in her statement, nor provided them with a copy of what Ms. Doe had written.

87. Principal Bowman told Mrs. Doe that it was PRSD's policy in cases like this to notify the police and send the student and her parents straight to the police station, which is what the school would like to do with Ms. Doe.

88. Ms. Doe met her parents in Principal Bowman's office and the Doe family left PRHS.

89.     At no time during those conversations did anyone from PRSD inform Ms. Doe or her parents about Title IX or Ms. Doe's Title IX rights, or identify the District's Title IX Coordinator, if any such person existed.

90.     From the school, Ms. Doe's parents took Ms. Doe directly to the Northern Regional Police Department ("NRPD") to report the assault.

91.     When they arrived, it was clear that Principal Bowman had called ahead and alerted the police that a student reporting sexual assault would be arriving soon.

92.     At the police station, Ms. Doe provided a full video-recorded verbal statement to Detective Scott Rick and recounted each detail of the assaults that she had endured, including digital penetration, oral-vaginal sodomy, oral-penile sodomy, vaginal penetration, and attempted anal penetration.

93.     When the Doe family left the police station, Student 3 sent a message to Ms. Doe saying, "If you have to talk to the cops, make me look innocent."

94.     Immediately after leaving the police department, Ms. Doe's parents took her to the Children's Hospital of Pittsburgh, where Ms. Doe received medical care and underwent a forensic rape kit examination.

95.     Among other things, the forensic examination documented bruises on Ms. Doe's arm and leg, which were the result of Student 3 physically restraining Ms. Doe as she tried to escape and forcibly holding her down as he raped her.

96.     While Mrs. Doe was in the emergency waiting room, Principal Bowman called her with instructions that Ms. Doe should not attend school the next day.

97.     The sexual assault forensic examination was so extensive that, although Ms. Doe and her parents arrived at the hospital around 4:00 p.m., they did not return home until after midnight.

98.     When the Doe family finally left the hospital, Ms. Doe and Mrs. Doe sobbed the entire drive home.

### The School District Refused to Investigate Ms. Doe's Report of Sexual Assault as a Matter of District Policy & Failed to Inform Ms. Doe or Her Parents About Her Title IX Rights

99.     The severe impact of the trauma Ms. Doe endured was apparent immediately.

100.    Ms. Doe was afraid to use bathrooms, even in her own home, and would only do so with her eyes shut.  Ms. Doe was also afraid to eat or drink, knowing that it would inevitably lead to her needing to use the bathroom.

101.    Ms. Doe was in frequent physical pain in the days and weeks after the assault and had difficulty sitting or standing without pain.

102.    Ms. Doe also experienced daily flashbacks to the assault and nightmares every night, preventing her from sleeping.

103.    In the weeks following the assault, Ms. Doe was unable to attend school because of the emotional trauma and physical pain that resulted from the attack.

104.    During that time, the only contact the Doe family received from the District was an inundation of school assignments that Ms. Doe was expected to complete.

105.    At the end of January, the Doe family attended Ms. Doe's previously scheduled IEP meeting, where she was granted an at-home education placement ("NOREP") due to her inability to return to school after the trauma.

106.    Upon information and belief, Student 3 was out of school during that time solely because he was the subject of a felony police investigation, but no one from PRSD

15

communicated that information to the Doe family or offered Ms. Doe accommodations under Title IX to facilitate her return to PRHS.

107.    At all relevant times, Title IX required that, once a school has notice of alleged sexual harassment "the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation."

108.    As part of that mandate, at all relevant times, Title IX also prohibited schools from relying entirely on investigations by law enforcement as a means to respond to reports of student-on-student sexual harassment.  The reason was obvious: "because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively."

109.    In early March, NRPD Detective Rick informed Ms. Doe's parents that the District Attorney had decided not to pursue criminal charges based on Ms. Doe's report.

110.    The next day, Friday March 8, 2019, Ms. Doe's parents spoke to the District Attorney and realized that she had not been provided the full information regarding Ms. Doe's report and was relying on Ms. Doe's incomplete, handwritten statement that she had started to write at school, rather than her full, video-recorded interview with the police.

111.    During that phone call, the District Attorney assured Ms. Doe's parents that Ms. Doe's case would remain open until she had the chance to review the full transcript of Ms. Doe's police interview.

112.    That same day, Ms. Doe's parents received a phone call from PRHS, explaining that the District had learned that no charges would be filed and stating that they looked forward to Ms. Doe returning to school the following Monday.

113.    Ms. Doe's parents informed the District that their information was incorrect and that the criminal case was still open.  Mr. and Mrs. Doe also made clear that Ms. Doe was in no shape to return to school.

114.    The following Monday, Ms. Doe learned from her friend that Student 3 was back in school despite Mr. and Mrs. Doe repeatedly informing school administrators that the criminal case was still ongoing.

115.    Ms. Doe's friend also indicated that because of Student 3's presence, she no longer felt safe at school.

116.    That same day, Mr. and Mrs. Doe received a phone call from Assistant Superintendent Mike Pasquinelli, Director of Special Education Noel Hustwit, and Principal Bowman.

117.    During that phone call, the PRSD administrators told Mr. and Mrs. Doe that they understood the criminal case had closed and Mr. and Mrs. Doe once again informed the PRSD administrators that they had spoken to the District Attorney on Friday and the case was still open.

118.    At this point in time, not a single PRSD administrator or employee had informed the Does about Title IX or Ms. Doe's Title IX rights, or identified the District's Title IX Coordinator, if any such person existed.

119.    However, at this point, the Does had started to do their own research and had begun learning about Title IX, and Mr. Doe asked the PRSD administrators about Title IX.

120.    The administrators responded vaguely that "in some cases" the school will move forward with an internal investigation after the police investigation concludes, but that decision was made by building administrators on a case-by-case basis.

121.    None of the administrators indicated that the District had any intention of investigating Ms. Doe's report, despite being required to do so by Title IX.

122.    Throughout April and May, Ms. Doe's mother called the NRPD and was told that the criminal case was still open, which the Doe family repeatedly communicated to the District and expressed concern to District administrators that Student 3 was attending school, despite the open criminal investigation and the District's refusal to conduct its own investigation.

123.    On May 16, 2019, Mr. and Mrs. Doe attended Ms. Doe's in-person IEP meeting and once again reiterated to all attendees, including Assistant Principal Stephanie Svilar, that the criminal case was still open and asked about the school's internal investigation procedure.

124.    Yet again, Mr. and Mrs. Doe were told that when a criminal act is alleged, PRSD's policy was to defer to the police investigation and that the school would not be conducting its own investigation into Ms. Doe's report of sexual assault, despite being required to do so by Title IX.

125.    On Monday, May 20, 2019, after learning that Student 3 was still attending school, Mr. Doe sent an email to PRSD Superintendent Brian Miller, asking again to know the status of PRSD's internal investigation of Ms. Doe's report of sexual assault that had occurred four months earlier and whether Student 3 was permitted to attend school or had been disciplined.

126.    Superintendent Miller never responded to Mr. Doe's email.

127.    Instead, Superintendent Miller forwarded the email to Owen Kenney, Director of Human Resources and Legal Affairs.

128.    Kenney wrote an email to Mr. Doe confirming the District's policy of not investigating reports of sexual assault despite being required to do so by Title IX and stated:

"Any time the district receives an allegation of sexual assault, we immediately turn that investigation over to the Northern Regional Police Department (NRPD), as we did in this case. There is not a parallel, internal investigation performed by the district."

129.    Kenney also informed Mr. Doe that the District was not permitted to discuss the status of Student 3 or any consequences he did or did not receive.

130.    Only in response to Mr. Doe's direct inquiry about whether Kenney himself was the District's Title IX Coordinator did Kenney reluctantly admit that he was.

131.    Despite insisting to the Doe family that the criminal investigation had concluded, the District never interviewed Ms. Doe or otherwise sought information from the Doe family about Ms. Doe's report of sexual assault.

132.    In July 2019, Ms. Doe and her parents were informed that the District Attorney had made a final decision not to pursue criminal charges against Student 3.

133.    From March to June 2019, the District repeatedly denied that the criminal case against Student 3 was still pending, ignored the Doe family's repeated statements that the police were continuing to investigate, and permitted Student 3 to attend school, apparently without any restrictions or corrective action.

134.    On July 10, 2019, Owen Kenney sent an email to Mr. and Mrs. Doe with a "summary letter of the investigation" into Ms. Doe's report of sexual assault, confirming that the District had not and would not conduct its own independent investigation into Ms. Doe's report of sexual harassment and assault, as required by Title IX.  The letter did not state whether the District had determined that Ms. Doe suffered sexual harassment, nor did it indicate whether Student 3 was responsible for perpetrating that harassment.

135.     The letter did not mention Title IX or Ms. Doe's Title IX rights, despite Kenney's prior assertion that he was the District's designated Title IX Coordinator, nor did it mention any sexual harassment policy the school had.

### *Ms. Doe Suffered Extraordinarily as a Result of the Sexual Assault & The District's Refusal to Address the Discrimination She Faced*

136.     In the aftermath of the horrific sexual assault Ms. Doe suffered, compounded by the District's continued refusal to investigate her report or take action to prevent or protect her from further harassment, Ms. Doe was left with no choice but to leave school.

137.     Faced with the impossible prospect of encountering Student 3 on a daily basis and the District's repeated refusal to investigate or take any meaningful corrective action to address the hostile environment, Ms. Doe sought refuge through continued homebound instruction for the remainder of her tenth-grade year.

138.     Ms. Doe suffered from severe symptoms of anxiety and depression and was eventually diagnosed with Post-Traumatic Stress Disorder ("PTSD") as a direct result of Student 3's attack.  Ms. Doe also suffered from insomnia and panic attacks as a result of the assault.

139.     Ms. Doe was diagnosed with pelvic floor dysfunction requiring specialized treatment.  Her symptoms included vaginal and rectal burning; pain with urination; pain, difficulty, and blood with bowel movements; incontinence; and persistent deep pelvic ache.  Ms. Doe's symptoms were so severe that she was often unable to leave the house, even for short periods of time.

140.     Ms. Doe was also diagnosed with visceral hyperalgesia (increased sensitivity to pain in her internal organs) and functional abdominal pain (chronic stabbing, tearing, and pins and needles abdominal pain) resulting from the assault.  In addition, Ms. Doe suffered from

esophageal burning and chronic vomiting requiring hospitalization in the aftermath of the assault.

141.    In the year after the assault, Ms. Doe required 98 different medical interventions—including therapy appointments, psychiatric attention, visits to the emergency room, and inpatient hospitalizations—directly related to the severe trauma she suffered at the hands of Student 3.

### *Ms. Doe Was Further Deprived of Her Educational Opportunities & Benefits When She Unable to Return to PRHS in Fall 2019 & The District Retaliated Against Ms. Doe By Seeking to Remove Her From PRHS*

142.    When the new school-year began in Fall 2019, the District had made clear that it was not going to take any action to address the sexual harassment Ms. Doe had suffered or take any action to prevent its recurrence.

143.    The District's failure to address sexual harassment was nothing new to the Doe family, as the District had previously failed to meaningfully address Ms. Doe's reports of sexual harassment during the 2017–2018 academic year.

144.    Recognizing that neither law enforcement nor the District would take any action to protect Ms. Doe, the Doe family sought a Sexual Violence Protection Order in Allegheny County Court against Student 3 on behalf of Ms. Doe.

145.    On August 28, 2019, the court granted Ms. Doe a temporary protection order and, according to Pittsburgh Action Against Rape, Ms. Doe became the first minor in Allegheny County to successfully obtain a Sexual Violence Protection Order against another minor.

146.    The following day, Mr. Doe provided Principal Bowman with a copy of the protection order, which the Doe family had been instructed to provide to the District.

147.    Student 3 eventually signed a Consent Agreement to stay away from Ms. Doe until she graduated from PRHS.  The Doe family informed the District of that Agreement and

advised them that if Student 3 violated the Agreement, they would immediately return to court to obtain a permanent protection order against him.

148.    On September 6, 2019, Mr. and Mrs. Doe received another "summary letter" from Owen Kenney addressing for the first time the purported steps the District took in response to Ms. Doe's April 2018 reports of sexual and racial harassment—a full year and a half *after* Ms. Doe initially made those reports—and reiterating that the District had not and would not conduct an independent investigation in Ms. Doe's report of sexual harassment and assault by Student 3.

149.    Once again, the letter did not mention Title IX or Ms. Doe's Title IX rights, despite Kenney's prior assertion that he was the District's designated Title IX Coordinator.

150.    Left with no other option, Ms. Doe continued her homebound learning rather than attend school alongside the student who had violently assaulted her.

151.    Throughout Fall 2019, no one from the District mentioned Title IX or Ms. Doe's Title IX rights, nor attempted to secure Ms. Doe the Title IX accommodations necessary for her to regain access to her education free from sex discrimination.

152.    The hostile environment at PRHS and Ms. Doe's resort to homebound learning deprived Ms. Doe of her ability to learn in-person alongside her peers and teachers and participate in the school activities she had once loved, including band, athletics, and JROTC.

153.    During Fall 2019, as the Doe family desperately sought ways for Ms. Doe to safely return to school, the District began to suggest that Ms. Doe attend an alternative school.

154.    At first when the District recommended that Ms. Doe transfer to an alternative school, Mr. and Mrs. Doe pushed back consistently and the District respected the family's decision.

155.    In October 2019, the District renewed its NOREP for Ms. Doe to continue homebound education following Ms. Doe's IEP meeting.

156.    Around that time, Mr. and Mrs. Doe indicated to PRHS administrators that they were considering filing a complaint with the Department of Education, Office for Civil Rights ("OCR"), as their repeated efforts to force the District to comply with its federally mandated Title IX obligations failed.

157.    On December 18, 2019, at Ms. Doe's regularly scheduled IEP meeting, District administrators verbally recommended that Ms. Doe transfer to an alternative high school.

158.    During that meeting, Mr. Doe, exasperated, expressed his disbelief that the District would recommend Ms. Doe transfer out of PRHS while Student 3 was permitted to continue his education uninterrupted.

159.    Shortly after that meeting, the District issued a written NOREP signed by Superintendent Miller recommending that Ms. Doe transfer out of PRHS into an alternative school placement.

160.    As they always had, Mr. and Mrs. Doe verbally declined the NOREP because the proposed alternative placement was located far away from everything and everyone Ms. Doe knew, would result in additional trauma to Ms. Doe, and indicated to Ms. Doe and her parents that her education mattered less than Student 3's education, which he was allowed to continue unimpeded.

161.    On January 5, 2020, Mr. Doe submitted a complaint to the U.S. Department of Education, Office for Civil Rights regarding the District's deliberate indifference to sexual harassment and assault.

162.     That same day, Mr. and Mrs. Doe filed a formal written complaint with the District and asserted that the District's actions and inaction following Ms. Doe's sexual assault discriminated against Ms. Doe on the basis of sex and reminded the District again of its federally mandated obligations under Title IX.

163.     On January 26, 2020, the District notified Mr. and Mrs. Doe that it intended to disregard their verbal declination of the December 2019 NOREP, move forward with that placement against the family's wishes, and formally remove Ms. Doe from PRHS.

164.     Mrs. Doe subsequently declined the NOREP in writing.

165.     Shocked by the District's aggressive response, Mr. and Mrs. Doe were left with no other choice than to seek legal counsel to protect Ms. Doe's rights to remain as a PRHS student.

166.     The Doe family spent months fighting the District's attempts to formally remove Ms. Doe from PRHS and place her in an alternative school.

### The District Continued its Pattern of Deliberate Indifference When it Hired Legal Counsel to Conduct a Sham Investigation into Ms. Doe's Report of Sexual Assault More Than a Year After Ms. Doe Initially Reported

167.     In response to the formal written complaint Mr. and Mrs. Doe filed with the District on January 5, 2020, Assistant Superintendent Pasquinelli advised the Doe family that District administrators had reviewed their complaint and were retaining independent legal counsel to assist in further review of the matter.

168.     On January 24, 2020, Assistant Superintendent Pasquinelli further advised the Doe family that the District had retained "independent legal counsel to review the investigative file" and refused Mr. Doe's request for an in-person meeting to discuss the issues raised in the complaint.

169.    On February 3, 2020, the Doe family received a letter from attorney Patricia

Monahan identifying herself as legal counsel appointed by PRSD to "independently investigate"

Mr. and Mrs. Doe's January 5, 2020 complaint.

170.    Upon information and belief, Monahan's legal practice focuses largely on

defending public entities from discrimination and retaliation claims.

171.    Monahan immediately made her allegiance clear in her letter, stating that she had

been unable to discern how anything the District had done was discriminatory and reiterating the

District's policy of deferring to all law enforcement investigations pursuant to the Memorandum

of Understanding ("MOU") between NRPD and PRSD.

172.    Monahan also refused to provide any information regarding any corrective or

disciplinary action the District took against Student 3 due to "confidentiality."

173.    Finally, Monahan advised Mr. and Mrs. Doe that she concluded that the District's

"investigation" was reasonable, but that the District was nonetheless willing to re-open the

matter so that she could meet with Ms. Doe and her parents.

174.    Monahan's letter mentioned Title IX only once, and then only to defend the

District's Discipline Code and assert her opinion that it was not violative of Title IX.

175.    Monahan never advised Ms. Doe or her parents of their rights under Title IX.

176.    On February 25, 2020, the Doe family met with Monahan and presented her with

a binder full of evidence corroborating Ms. Doe's report that Student 3 raped and sexually

assaulted her on January 7, 2019.

177.    During that meeting a disagreement arose between the Doe family and Monahan

because Monahan insisted that Title IX's obligation that schools inform victims and their parents

25

about the outcome of any Title IX investigation and punishment given to the perpetrator did not

apply to K–12 schools.

178.     Several days later, Mr. Doe sent an email to Superintendent Miller and Assistant

Superintendent Pasquinelli asserting a number of concerns related to Monahan and her ability to

satisfy Title IX's requirement of an equitable investigation, including:

    a.     Monahan's assertion that educational issues were not her area of expertise;

    b.     That Monahan repeatedly stated that she did not understand how Ms. Doe

           could have been discriminated against by the District based on an insufficient

           investigation because Ms. Doe was not a member of a protected class,

           indicating her failure to understand the concept of sexual harassment; and

    c.     That Monahan asked, because Ms. Doe would "obviously never let [Student

           3] do this to her again, how could his presence in the building be a problem?"

           indicating her failure to understand the concept of a hostile environment and

           relying on the inaccurate stereotype that the only subsequent trauma a rape

           victim could experience would be a second rape.

179.     On March 10, 2020, Monahan contacted Mr. and Mrs. Doe and advised them that

she had submitted her final report to the District and continued to refute the fact that Title IX

obligations applied with equal force to K–12 schools.

180.     Upon information and belief, nothing in Monahan's sham investigation was

investigative at all, but simply involved reaffirming the District's prior decision to disregard Ms.

Doe's report of sexual assault and harassment.

181.     Despite not speaking to either Ms. Doe or Student 3, Monahan nonetheless concluded that there was insufficient evidence as a matter of law to conclude that Ms. Doe had been sexually assaulted or raped on January 7, 2019.

182.     The flaws in Monahan's report were numerous, from failing to identify which, if any, standard of proof she applied and egregiously misstating the central inquiry of a Title IX investigation, to speculating about the possible reasons why the District Attorney declined to pursue criminal charges against Student 3 and relying on false and offensive rape myths.

183.     Monahan revealed her ignorance of Title IX by repeating her erroneous assertion that Title IX did not apply with full force to K–12 schools and outrageously suggesting that Ms. Doe could not possibly have been the victim of discrimination by the District because she had never returned to school in the aftermath of the assault.

184.     Although Monahan's report was dated March 4, 2020, the District refused to inform the Doe family about its contents until late May 2020, preventing Ms. Doe from considering returning to school where Student 3 remained unrestricted.

185.     In late May 2020, the District advised the Doe family that "no further action" would be taken related to Ms. Doe's report of sexual assault and confirmed that the "District deems that issue to be closed."

186.     The letter did not mention Title IX or Ms. Doe's Title IX rights.

***Unsurprisingly, Student 3 Continued His Violent Behavior***

187.     While the District was focused on discrediting Ms. Doe and her report of sexual assault by Student 3, Student 3 was permitted to continue attending PRHS, emboldened to continue assaulting female students and threatening others.

188.     Upon information and belief, after Ms. Doe reported Student 3's violent assault, Student 3 went on to sexually assault at least one other female PRHS student repeatedly on school property.

189.     Additionally, upon information and belief, in early March 2020, Student 3 created a "hit list" that included at least three PRHS students, all of whom were students who could report him for sexual misconduct.

190.     Upon information and belief, Student 3 showed the hit list to numerous PRHS students on the bus and multiple students confirmed that they had personally seen the hit list.

191.     According to the police investigation into the report, the Assistant Superintendent produced a "Snapchat statement" corroborating the hit list and Student 3's threat to "shoot up the school."

### *Ms. Doe Continued to Suffer Greatly As a Result of the Assault & the District's Deliberate Indifference to Her Rights for the Rest of Her High School Career*

192.     Throughout 2020, Ms. Doe continued to suffer physical distress related to the attack and District's deliberate indifference.

193.     Ms. Doe continued to suffer from extreme abdominal and pelvic pain, pelvic floor dysfunction, and PTSD symptoms including flashbacks, panic attacks, anxiety, depression, and insomnia.

194.     By her junior year of high school, Ms. Doe had developed severe cyclical vomiting as a result of the trauma of the assault.  Those attacks often lasted weeks at a time and caused Ms. Doe to become severely dehydrated to the point of vomiting blood.

195.     During her senior year of high school, Ms. Doe was diagnosed with Functional Neurological Deficit, a condition associated with severe trauma, which manifested with loss of sensation and blindness as a result of severe trauma and lasted for months.

196.     To date, Ms. Doe has required 12 inpatient hospitalizations related to injuries from the assault, totaling 55 days.

197.     Throughout the remainder of her high school career, Ms. Doe was never able to return to in-person learning at PRHS.

198.     Her education continued to suffer greatly as a result, including an avalanche of incompletes throughout her tenth- and eleventh-grade years.

199.     Although she eventually graduated from PRHS in 2021, Ms. Doe had far from a normal educational experience.

200.     Although she enrolled in college in Fall 2021, by the end of her first semester, Ms. Doe was forced to seek a medical withdrawal based on the numerous injuries and medical issues she continues to suffer as a result of the assault and District's subsequent actions and inaction.

### *PRSD Has a Lengthy & Troubling History of Deliberate Indifference to Sexual Harassment*

201.     Despite the devastation of Ms. Doe's high school experience, both she and her parents have become advocates for victims of sexual violence in schools.

202.     In September 2020, despite not physically attending high school and often being hospitalized, Ms. Doe founded a student club at PRHS dedicated to educating students and working together to end sexual harassment and assault.

203.     A year later, in September 2021, Ms. Doe's student club had grown from its first chapter at PRHS to become a national student organization in high schools across the country.

204.     Ms. Doe and her family have continued to raise awareness around issues of sexual harassment and assault, including by repeatedly petitioning the PRSD School Board to take action and investigate the District's failure to comply with Title IX.

205.    In response to Ms. Doe's activism, the District has continued to try to silence her. When Ms. Doe spoke publicly about her assault for the first time at a School Board meeting in August 2021, a District representative interrupted her, tried to prevent her from speaking, and attempted to censor her statement to prohibit her from saying she had been raped.

206.    In response to the Doe family's vocal opposition to the District's response to sexual harassment and assault, the family has received contact from other local families sharing their own similar experiences with PRSD administration's indifference toward known sexual harassment.

207.    In 2021, another concerned community member filed a Right-to-Know request with the District requesting that it produce all complaints it had received of harassment, bullying, and assault from September 2016 to present.

208.    The District fought the request and was eventually ordered by a court to produce the requested information, with an exception established by statute that excluded the District's production of those complaints in response to which the District had performed a non-criminal investigation.

209.    In response, the District identified 169 complaints it had received that purportedly fell under that exception.

210.    Upon information and belief, in a further act of deliberate indifference to sexual harassment and attempt to avoid disclosure of unaddressed reports of sexual harassment, a portion of those 169 complaints were instances in which the District opened a sham investigation, including for complaints dating as far back as 2018, for the sole purpose of avoiding disclosure of those reports pursuant to the court order.

***The School District Failed to Provide Essential Title IX or Sexual Harassment
Training to Administrators, Staff, Students, and Students' Parents***

211.    More than two decades ago, the United States Supreme Court stated that "[t]he

number of reported cases involving sexual harassment of students in schools confirms that

harassment unfortunately is an all too common aspect of the educational experience." *Gebser v.

Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998).

212.    In 1999, the United States Supreme Court determined that schools may be held

liable through private Title IX actions for monetary damages when they are deliberately

indifferent to student-on-student sexual harassment, which includes student-on-student sexual

assault. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999).

213.    Since 1997, the United States Department of Education, Office for Civil Rights

("OCR") has repeatedly reminded schools of their responsibility to address sexual harassment

and to train their staff accordingly, in both policy guidance documents and public

communications.

214.    In January 2001, OCR issued *Revised Sexual Harassment Guidance: Harassment

of Students by School Employees, Other Students, or Third Parties* (hereinafter, "2001

Guidance"), informing all U.S. schools receiving federal financial assistance, including

Defendant PRSD, that "[p]reventing and remedying sexual harassment in schools is essential to

ensuring a safe environment in which students can learn."[2]

215.    In the 2001 Guidance, OCR also reminded schools that student-against-student

sexual misconduct constitutes prohibited sexual harassment and emphasized the importance of

training, stating:

> [S]chools need to ensure that employees are trained that that those
> with authority to address harassment know how to respond

---

[2]  The U.S. Department of Education formally withdrew the 2001 Guidance on August 26, 2020.

appropriately, and other responsible employees know that they are obligated to report sexual harassment to appropriate school officials. Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

216.    With respect to student-on-student sexual harassment, the 2001 Guidance stated:

If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows . . . about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence. . . . [I]f, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex.

217.    The 2001 Guidance further advised schools of the "immediate and appropriate steps" they must take to investigate or otherwise determine what occurred, which include "prompt and effective steps" to end the harassment, eliminate a hostile environment, and prevent its recurrence, and instructed that these "are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action."

218.    The 2001 Guidance also reminded schools that "because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively."

219.    In January 2006, OCR issued *Dear Colleague Letter – Sexual Harassment Issues*, to U.S. public schools, including Defendant PRSD, stating, "[u]nfortunately, a significant number of students are still subjected to sexual harassment, which can interfere with a student's education as well as his or her emotional and physical well-being," and reminding public schools

of their obligation "to take immediate and effective steps to end sexual harassment when it occurs, prevent its recurrence, and remedy its effects."

220.    In September 2008, OCR issued *Sexual Harassment: It's Not Academic*, reiterating that unwelcome student-on-student sexual touching is sexual harassment, and that sexual harassment includes rape, sexual assault, dating violence, and sexually motivated stalking.

221.    On April 4, 2011, OCR sent *Dear Colleague Letter: Sexual Violence* (hereinafter, "2011 Dear Colleague Letter"), to all U.S. public schools, including Defendant PRSD, issuing a "call to action" to the nation's schools because of "deeply troubling" data regarding sexual violence in schools.

222.    In the 2011 Dear Colleague Letter, OCR informed schools, "[d]uring the 2007–2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools."

223.    The 2011 Dear Colleague Letter explained that "[a] number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, and sexual coercion, and reminded schools, including Defendant PRSD, unequivocally that "[a]ll such acts of sexual violence are forms of sexual harassment covered under Title IX."

224.    The 2011 Dear Colleague Letter also reminded schools, including Defendant PRSD, that they have an obligation to investigate reports of sexual harassment, must designate at least one employee to coordinate and comply with Title IX responsibilities, and recommended schools provide training and education to employees and students on sexual harassment and violence.[3]

---

[3]  The U.S. Department of Education withdrew the 2011 Dear Colleague Letter on September 22, 2017.  However, the statistics cited above have not changed, nor did the fact that Defendant

225.     On April 24, 2013, OCR sent *Dear Colleague Letter: Retaliation*, to all U.S.

public schools, including Defendant PRSD, reminding them that "[t]he ability of individuals to

oppose discriminatory practices, and to participate in OCR investigations and other proceedings,

is critical to ensuring equal educational opportunity in accordance with Federal civil rights laws"

and that retaliation is a violation of federal law.

226.     On April 29, 2014, OCR issued *Questions and Answers on Title IX and Sexual*

*Violence* (hereinafter, "2014 Questions & Answers"), reminding all U.S. public schools,

including Defendant PRSD, that when "a school knows or reasonably should know of possible

sexual violence, it must take immediate and appropriate steps to investigate or otherwise

determine what occurred" and, where "that sexual violence created a hostile environment, the

school must then take prompt and effective steps reasonably calculated to end the sexual

violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy

its effects.  Most importantly, "a school should not wait to take steps to protect its students until

students have already been deprived of educational opportunities."[4]

227.     The 2014 Questions & Answers further admonished: "If a school delays

responding to allegations of sexual violence or responds inappropriately, the school's own

inaction may subject the student to a hostile environment."

228.     Additionally, the 2014 Questions & Answers explained that:

---

PRSD was on notice of its obligations under Title IX.  Moreover, the 2020 Title IX regulations,
34 C.F.R. § 106.45 formally implemented the same general obligations on schools receiving
federal funding.

[4]  The U.S. Department of Education withdrew the 2014 Questions & Answers on September 22,
2017.  However, the statistics cited above have not changed, nor did the fact that Defendant
PRSD was on notice of its obligations under Title IX.  Moreover, the 2020 Title IX regulations,
34 C.F.R. § 106.45 formally implemented the same general obligations on schools receiving
federal funding.

> while a criminal investigation is initiated at the discretion of law enforcement authorities, a Title IX investigation is not discretionary; a school has a duty under Title IX to resolve complaints promptly and equitably and to provide a safe and nondiscriminatory environment for all students, free from sexual harassment and sexual violence. Because the standards for pursuing and completing criminal investigations are different from those used for Title IX investigations, the termination of a criminal investigation without an arrest or conviction does not affect the school's Title IX obligations.

In short, "even if a criminal investigation is ongoing, a school must still conduct its own Title IX investigation" and "should not wait for the conclusion of the criminal investigation or criminal proceeding to begin its own Title IX investigation."

229.    On April 24, 2015, OCR sent *Dear Colleague Letter: Title IX Coordinators* and issued a *Title IX Resource Guide* to all U.S. public schools, including Defendant PRSD, reminding schools of their obligation to designate at least one employee as a Title IX Coordinator who is responsible for coordinating the school's efforts to comply with and carry out the school's Title IX responsibilities, pursuant to 34 C.F.R. § 106.8(a).  OCR stated, "In our enforcement work, OCR has found that some of the most egregious and harmful Title IX violations occur when a recipient fails to designate a Title IX coordinator or when a Title IX coordinator has not been sufficiently trained or given the appropriate level of authority to oversee the recipient's compliance with Title IX."

230.    On September 22, 2017, OCR issued *Q&A on Campus Sexual Misconduct*, advising all U.S. public schools, including Defendant PRSD, that "[w]hether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where a school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and respond appropriately," including by conducting "a fair, impartial investigation in a timely manner."

231.    Upon information and belief, despite clear notice by the U.S. Supreme Court and OCR regarding the District's obligations to prevent and remediate the effects of sexual harassment, at all relevant times, the District failed to provide training or education to administrators, staff, students, and families regarding Title IX and student-on-student sexual harassment.

232.    Upon information and belief, at all relevant times the District failed to provide training or education to administrators, staff, students, and families on protecting students from sexual harassment and violence; recognizing signs of sexual harassment; understanding what constitutes sexual harassment; proper reporting of student-on-student sexual harassment; investigating reports of sexual harassment; remediating sexual harassment and violence; and the prohibition on retaliating against students who report sexual harassment.

233.    Upon information and belief, prior to May 2019, the District had no Title IX Coordinator or other employees designated to handle complaints of sexual harassment who were adequately trained in receiving, coordinating, or investigating reports of sexual harassment and discrimination against students.

234.    Upon information and belief, at all relevant times, the District did not publicly identify or otherwise make known the identity of the Title IX Coordinator, to the extent any such person existed.

235.    Upon information and belief, the District only designated Owen Kenney, Director of Legal Affairs (i.e., legal counsel for the District), to serve as the Title IX Coordinator after Ms. Doe made her initial report of sexual assault to the District, yet failed to adequately train Kenney to receive, coordinate, or investigate reports of sexual harassment and discrimination against students or protect against conflicts of interest.

236.     Upon information and belief, at all relevant times, the District officially adopted sexual harassment policies that were inequitable and inadequate with respect to investigating and properly responding to reports of student-on-student sexual harassment and, in any event, failed to provide training or education on those policies to administrators, staff, students, and parents.

237.     The District's lack of training is evidenced by, among other things, Defendants' failure to take any meaningful action to protect Ms. Doe from Student 3's or Student 1's sexual harassment at school; the District's failure to investigate Student 3's or Student 1's known sexual harassment against Ms. Doe; the District's failure to investigate other reports of known sexual harassment by Student 3 as required by Title IX, both before and after Ms. Doe's assault; the District's failure to offer any accommodations or counseling to Ms. Doe after learning that Student 3 sexually harassed and assaulted her at school, as required by Title IX; Principal Bowman's instruction to Mrs. Doe that Ms. Doe could not attend school the day after the assault; the failure to inform Ms. Doe or her parents about Title IX, Ms. Doe's Title IX rights, or the identity of the Title IX Coordinator, to the extent any such person existed; the District's policy of deference to law enforcement's investigation of Ms. Doe's report of sexual assault on school grounds; the District's participation in and misinterpretation of the MOU with NRPD; the District's repeated misrepresentation of the status of the criminal investigation of Ms. Doe's report of sexual assault; the retaliatory actions taken against Ms. Doe in response to her reports of sexual harassment and assault; and the wholesale adoption of Patricia Monahan's egregiously flawed "investigative" report, which demonstrated a complete disregard or failure to understand the requirements of Title IX, including whether Title IX even applied to K–12 institutions.

## CLAIMS

### COUNT I
**Pre-Assault Deliberate Indifference to Prior Sexual Harassment,
in Violation of Title IX, 20 U.S.C. § 1681, *et seq.***

238.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

239.    The District is a federal fund recipient within the meaning of Title IX.

240.    No later than April 2018, the District had actual knowledge that Ms. Doe had reported ongoing sexual harassment by Student 1 and ongoing racial harassment by Student 2.

241.    The District failed to investigate as required by Title IX and/or take any meaningful corrective action in response to Ms. Doe's reports of sexual harassment and racial harassment during the 2017–2018 school year.

242.    The District's failure to remedy the hostile environment that Ms. Doe suffered at PRHS left her uniquely vulnerable to further harassment, created a climate that tolerated both sexual and racial harassment of Ms. Doe, and emboldened other students to continue harassing Ms. Doe with impunity.

243.    Upon information and belief, by no later than September 2018, the District had actual knowledge of at least one report of Student 3's sexual harassment, and the substantial risk Student 3 posed of sexually harassing and abusing other female students, including Ms. Doe.

244.    Upon information and belief, the individuals with actual knowledge had the authority and ability to investigate and take meaningful corrective action to end or prevent Student 3's sexual harassment, assaults, and violence against female students, including Ms. Doe, but failed to do so.

245.    The District's failure to investigate prior reports of sexual harassment by Student 3, or take any corrective action against him, created a climate in which Student 3's sexual

misconduct was tolerated, thus encouraging Student 3's sexual harassment, assaults, and violence against Ms. Doe, and proximately caused injury to Ms. Doe.

246.    The District had actual knowledge that Student 3 reportedly sexually harassed at least one other female student prior to assaulting Ms. Doe, and that he posed a substantial risk of sexually harassing and abusing other students, yet it took no action to protect other female students from Student 3, and proximately caused injury to Ms. Doe.

247.    The District maintained a policy of deliberate indifference to reports of sexual misconduct, harassment, or assault by refusing, categorically, to investigate those types of reports.

248.    The District's refusal to investigate or take corrective action in response to sexual harassment, assault, and violence that occurred at school permitted such discrimination to persist unchecked, and thereby created a heightened risk of sexual harassment.

249.    As a result of the District's deliberate indifference, Ms. Doe was subjected to sexual harassment, assault, and violence by Student 3.

250.    The sexual harassment, assault, and violence Student 3 inflicted on Ms. Doe was severe, pervasive, and objectively offensive, and effectively barred Ms. Doe's access to educational opportunities and benefits.

251.    As a direct and proximate result of the District's action, inaction, and deliberate indifference, Ms. Doe sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

     a.     Past, present, and future physical and psychological pain, suffering and impairment;

     b.     Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

     c.     Impaired educational capacity and future earnings capacity;

    d.      Attorneys' fees and costs; and

    e.      Such other and further relief as this Court deems just and proper.

### COUNT II
### Post-Report Deliberate Indifference
### in Violation of Title IX, 20 U.S.C. § 1681, *et seq.*

252.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated here.

253.    The District is a federal fund recipient within the meaning of Title IX.

254.    Ms. Doe suffered sexual harassment by Student 1 at school during the 2017–2018 school year that was sufficiently severe, pervasive, an objectively offensive that it created a hostile educational environment for her.

255.    Ms. Doe suffered sexual harassment by Student 3 at school during the 2018–2019 school year that was sufficiently severe, pervasive, and objectively offensive that it created a hostile educational environment for her.

256.    The District had substantial control over both Student 1 and Student 3, as well as the context in which Student 1 sexually harassed and Student 3 sexually assaulted Ms. Doe— namely, on school grounds.

257.    The District had actual notice of Student 1's sexual harassment no later than April 9, 2018, when Ms. Doe and her parents filed a written complaint of sexual harassment to Principal Bowman, and April 11, 2018 when Ms. Doe and her mother met with Assistant Principal Burns to discuss the report.

258.    The District had actual notice of Student 3's sexual harassment and assault of Ms. Doe on the same day the assault occurred, January 7, 2019, when Ms. Doe reported the assault to Chief Gasparetto, Shawn McCartan, and Principal Bowman.

259.    Principal Bowman and Assistant Principal Burns were appropriate persons within the meaning of Title IX, with the authority to address the sexual harassment Ms. Doe suffered, investigate Ms. Doe's reports, and take meaningful corrective action to end or prevent the sexual harassment Ms. Doe endured on the District's behalf.

260.    After the assault, from January 2019 until Ms. Doe graduated in 2021, Ms. Doe and her family reminded District officials, including the District's Superintendent, Principal Bowman, Assistant Principal Svilar, and others, about Student 3's sexual harassment and assault of Ms. Doe and the substantial danger he posed to her.

261.    The District acted with deliberate indifference to reports that Student 1 had sexually harassed Ms. Doe on a daily basis during the 2017–2018 school year, and reports that he posed a continuing danger to Ms. Doe, which caused Ms. Doe to suffer a hostile educational environment.

262.    The District acted with deliberate indifference to reports that Student 3 had sexually harassed Ms. Doe (and other students) during the 2018–2019 school year, and reports that Student 3 posed a continuing danger to Ms. Doe, which caused Ms. Doe to suffer a hostile educational environment.

263.    The District's response to the allegations of serial sexual harassment by Student 1, and the continuing danger he posed to Ms. Doe, was clearly unreasonable in light of the known circumstances.

264.    The District's response to the allegations of serial sexual harassment by Student 1 and violent sexual assault by Student 3, and the continuing dangers they posed to Ms. Doe, was clearly unreasonable in light of the known circumstances.

265.     The District's failure to investigate Ms. Doe's report of daily sexual harassment during the 2017–2018 school year or take meaningful corrective action against Student 1 was clearly unreasonable in light of the known circumstances.

266.     The District's refusal, as a matter of policy, to independently investigate Ms. Doe's report of sexual assault or take meaningful corrective action against Student 3 was clearly unreasonable in light of the known circumstances.

267.     Through its actions and inaction, the District was deliberately indifferent to the sexual harassment, assault, and violence that Ms. Doe suffered at PRHS, and proximately caused injury to Ms. Doe.

268.     Through its actions and inaction, the District created a climate in which sexual misconduct was tolerated, thus encouraging Student 3's and Student 1's repeated sexual misconduct against Ms. Doe and others.

269.     Through its acts and omissions, the District acted with deliberate indifference to the above-described reports about Student 1 and Student 3 by, among other things:

     a.     Failing to appropriately investigate, remedy, and respond to reports that Student 3 had sexual assaulted and harassed Ms. Doe and other students during the 2018–2019 school year or reports that Student 1 sexually harassed Ms. Doe throughout the 2017–2018 school year;

     b.     Failing to take meaningful corrective action to stop Student 3 or Student 1 from further victimizing Ms. Doe and other classmates, including by choosing not to discipline or increase supervision of Student 3 or Student 1;

     c.     Failing to offer or provide educational accommodations, such as academic and psychological counseling, to Ms. Doe after learning of Student 3's sexual assault against her during the 2018–2019 school year or after learning of Student 1's serial sexual harassment during the 2017–2018 school year;

     d.     Failing to inform the Doe family of Ms. Doe's rights under Title IX, or identify the District Title IX Coordinator in 2017–2018 or 2018–2019;

e.      Penalizing Ms. Doe, a sexual assault victim, by forcing her to bear the entire burden of protecting herself from Student 3 and Student 1, knowing that she was required to resort to homebound education and sacrifice many educational benefits and opportunities in the process, while allowing Student 3 and Student 1 to continue their education paths without modification;

f.      Permitting Student 3 and Student 1 to continue attending the same school as Ms. Doe for the 2018–2019 and 2019–2020 academic years, particularly without putting a "no contact" order in place to prevent Student 3 or Student 1 from having any contact with Ms. Doe;

g.      Creating a climate that tolerated sexual harassment, assault, violence, and other misconduct, and that tolerated the complete disregard of reports of sexual misconduct by Student 3 and Student 1, or were deliberately indifferent thereto;

h.      Failing to develop or adopt policies and procedures to properly address complaints of student-on-student sexual harassment, assault, and violence;

i.      Failing to develop or adopt policies and procedures regarding prompt and equitable grievance procedures and investigation of reports of student-on-student sexual harassment, assault, and violence;

j.      Failing to provide policy, procedures, or training for administrators, employees, students, and parents about sexual harassment and assault;

k.      Failing to provide, offer, recommend, or coordinate adequate health, psychological, counseling, and academic assistance and services to Ms. Doe after she was sexually harassed, assaulted, and violated by Student 3 and Student 1, or being deliberately indifferent thereto;

l.      Failing to meaningfully supervise or monitor Student 3 or Student 1 at PRHS;

m.      Failing to designate a Title IX Coordinator for the District; and

n.      Through other actions, inaction, and deliberate indifference.

270.    The sexual harassment, assault, and violence Student 3 and Student 1 inflicted on Ms. Doe, along with the District's refusal to investigate or take any action in response to reports of Student 3's sexual misconduct against Ms. Doe and failure to investigate or take any action in response Student 1's serial sexual harassment of Ms. Doe effectively barred Ms. Doe's access to educational opportunities and benefits.  Ms. Doe was forced to continue homebound education,

where she was deprived of the benefit of interacting with peers and teachers in live classrooms, to escape the hostile environment created by the District's deliberate indifference. Ms. Doe was also forced to choose between her safety and her ability to participate in extracurricular activities.

271.    Ms. Doe also has suffered physical, psychological, and emotional harm due to Student 3's sexual assault, Student 1's sexual harassment, and the District's failure to take appropriate steps to respond to reports of the sexual assaults and prevent further sexual assaults from occurring.

272.    By its actions and inaction, the District acted with deliberate indifference toward the right of Ms. Doe to a safe and secure education environment free from sex discrimination, thus materially impairing Ms. Doe's ability to pursue her education at PRHS, in violation of the requirements of Title IX.

273.    As a direct and proximate result of the District's deliberate indifference, Ms. Doe sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

> a.    Past, present, and future physical and psychological pain, suffering and impairment;
>
> b.    Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;
>
> c.    Impaired educational capacity and future earning capacity;
>
> d.    Attorneys' fees and costs; and
>
> e.    Such other and further relief as this Court deems just and proper.

## COUNT III
## Retaliation in Violation of Title IX, 20 U.S.C. § 1681, *et seq.*

274.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

275.    Reporting sexual harassment to school officials is a statutorily protected activity under Title IX.  Reporting incidents of sex discrimination is integral to Title IX.

276.    Because Ms. Doe reported Student 3's sexual harassment to the District and the Doe family repeatedly insisted that the District abide by its federally mandated Title IX obligations, the District, through its agent Superintendent Miller, retaliated against Ms. Doe by issuing a NOREP for alternative placement for Ms. Doe to formally remove her from PRHS, on the basis that Ms. Doe suffered from an "emotional disturbance."

277.    The District's attempts to remove Ms. Doe from PRHS were materially adverse actions that excluded her from PRHS programs and activities, negatively impacted her education, deprived her of educational opportunities, and subjected her to a hostile education environment.

278.    As a direct and proximate result of the District's retaliation, Ms. Doe had sustained and continued to sustain injuries for which she is entitled to be compensated, including but not limited to:

      a.    Past, present, and future physical and psychological pain, suffering and impairment;

      b.    Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

      c.    Impaired educational capacity;

      d.    Attorneys' fees and costs; and

      e.    Such other and further relief as this Court deems just and proper.

## COUNT IV
### Failure to Train in Violation of Jane Doe's
### Constitutional & Federal Rights Pursuant to 42 U.S.C. § 1983

279.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

280.    The District is subject to 42 U.S.C. § 1983.

281.    Student-on-student sexual harassment that a school district refuses to remedy is a form of unlawful sex discrimination that violates a student's rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

282.    Plaintiff had federal civil rights secured by Title IX of the Education Amendments of 1972, which provides in pertinent part: "[N]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

283.    Title IX was intended to benefit students like Ms. Doe.

284.    Title IX provides students like Ms. Doe clear federal rights, which are not amorphous or vague, to be free from known sex discrimination at school.

285.    Title IX imposes a binding mandatory obligation on schools like PRHS and school districts like PRSD that receive federal funding that prohibits them from discriminating against students on the basis of sex.

286.    The U.S. Supreme Court has stated, "we conclude that Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools," and held that a plaintiff may bring causes of action under both Title IX and § 1983 for unlawful sex discrimination. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255–58 (2009).

287.    At all relevant times, the District had unconstitutional customs, policies, or practices of failing to properly or sufficiently train administrators, teachers, staff, volunteers,

students, and families concerning sex discrimination and sexual harassment against students; Title IX and/or student-on-student sexual harassment; and identifying, investigating, reporting, preventing, and remedying the effects of student-on-student sexual harassment.

288.    At all relevant times, the District had unconstitutional customs, policies or practices of failing to properly or sufficiently train administrators, teachers, staff, volunteers, students, and families concerning school policies on sex discrimination and sexual harassment against students, Title IX and/or student-on-student sexual harassment, and identifying, investigating, reporting, preventing, and remedying the effects of student-on-student sexual harassment.

289.    The District failed to provide such training to its administrators, teachers, staff, students, and families despite the patently obvious need for training on, among other things, student-on-student sexual harassment and preventing, identifying, investigating, reporting, stopping, and remediating the effects of sexual harassment.

290.    Numerous authorities, including the U.S. Supreme Court and U.S. Department of Education, made clear and gave notice to the District that school employees will confront student-on-student sexual harassment and abuse with regularity, given the high predictability, recurrence, prevalence, and injurious nature of such harassment and abuse in schools.  Thus, it was foreseeable and inevitable that the District's administrators and employees would encounter recurrent situations involving sexual harassment, including sexual assault, that implicated students' Constitutional and federal rights, and it did, in fact, encounter those recurring situations.

291.    The District failed to adequately train its administrators, teachers, staff, students, and families, and thereby failed to prohibit or discourage foreseeable sexual harassment and

assault, despite the clearly established and well-known dangers of sexual abuse, harassment, assault, battery, and violence faced by students in U.S. public schools.

292.    The District failed to provide such training in light of foreseeable consequences that could result from a lack of instruction, including, but not limited to, student-on-student sexual harassment, as Ms. Doe experienced.

293.    The District's failure to train its administrators, teachers, staff, students, and families amounted to deliberate indifference to the rights of students, with whom the District's employees had routine and regular contact.

294.    The District's failure to train its administrators, teachers, staff, students, and families caused Ms. Doe to suffer ongoing sexual harassment in violation of her Constitutional and federal rights.

295.    The District's failure to train administrators, staff, students, and families was deliberate, reckless, and in callous indifference to Ms. Doe's Constitutional and federal rights.

296.    The District's customs, policies, and practices for responding to reports of student-on-student sexual harassment, including reports of Student 3's sexual harassment of Ms. Doe and other students, were so clearly inadequate that they give rise to a reasonable inference that the District acquiesced in the sexual harassment.

297.    As a direct and proximate result of the District's deliberate indifference to and violation of Ms. Doe's established Constitutional and federal rights, Ms. Doe suffered, and continues to suffer, injuries for which she is entitled to be compensated, including but not limited to:

      a.    Past, present, and future physical and psychological pain, suffering and impairment;

      b.    Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

    c.      Impaired educational capacity and future earning capacity;

    d.      Attorneys' fees and costs; and

    e.      Such other and further relief as this Court deems just and proper.

**COUNT V**
**Hostile Environment Based on Race**
**in Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**

298.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

299.    The District is a federal fund recipient within the meaning of Title VI.

300.    During the 2017–2018 school year, Ms. Doe suffered harassment based on race by Student 2 that was sufficiently severe, pervasive, and objectively offensive that it created a hostile educational environment for her.

301.    The severe, pervasive, and objectively offensive harassment included Student 2 calling Ms. Doe the N-word hundreds of times over the course of the school year and repeatedly telling her to kill herself.

302.    The District had substantial control of Student 2 and the context in which he harassed Ms. Doe—namely, on school grounds.

303.    The District had actual notice of the racial harassment of Ms. Doe no later than April 11, 2018, when Ms. Doe verbally reported the harassment to Assistant Principal Burns and showed her the video evidence of that harassment.

304.    The District also had actual notice of the racial harassment when Ms. Doe verbally reported the harassment to Principal Bowman in August 2018 and showed her the video evidence of that harassment.

305.     The District acted with deliberate indifference to the reports that Ms. Doe was subjected to ongoing racial harassment, which caused Ms. Doe to suffer a hostile educational environment.

306.     The District's response to the allegations of serial racial harassment by Student 2 was clearly unreasonable in light of the known circumstances.

307.     Through its actions and inaction, the District was deliberately indifferent to the racial harassment that Ms. Doe suffered at PRHS, and proximately caused injury to Ms. Doe.

308.     Through its actions and inaction, the District created a climate in which racial harassment and discrimination was tolerated, thus encouraging Student 2's serial racial harassment against Ms. Doe and others.

309.     Through its acts and omissions, the District acted with deliberate indifference to the above-described reports about racial harassment by, among other things:

a.     Failing to appropriately investigate, remedy, and respond to reports that Student 2 harassed Ms. Doe by calling her the N-word and telling her to kill herself or go hang herself hundreds of times during the 2017–2018 school-year;

b.     Failing to take measures to stop Student 2 from further victimizing Ms. Doe and other classmates, including by choosing not to discipline or increase supervision of Student 2;

c.     Advising Ms. Doe that the harassment constituted protected speech and that the school could not and would not take any action against it;

d.     Failing to offer or provide educational accommodations, such as academic and psychological counseling, to Ms. Doe after learning of the ongoing racial harassment against her during the 2017–2018 school year;

e.     Penalizing Ms. Doe, the victim of race-based harassment, by forcing her to bear the entire burden of protecting herself from Student 2, while allowing Student 2 to continue his education path without modification;

f.      Permitting Student 2 to continue attending the same school as Ms. Doe for the 2018–2019 and 2019–2020 academic years, particularly without putting a "no contact" order in place to prevent him from having any contact with Ms. Doe;

g.      Creating a climate that tolerated race-based harassment and other misconduct, and that tolerated the complete disregard of reports of racial harassment, or were deliberately indifferent thereto;

h.      Failing to develop or adopt policies and procedures to properly address complaints of student-on-student racial harassment;

i.      Failing to develop or adopt policies and procedures regarding prompt and equitable grievance procedures and investigation of reports of student-on-student racial harassment;

j.      Failing to provide policy, procedures, or training for administrators, employees, students, and parents about racial harassment;

k.      Failing to provide, offer, recommend, or coordinate adequate health, psychological, counseling, and academic assistance and services to Ms. Doe after she was racially harassed by Student 2, or being deliberately indifferent thereto;

l.      Failing to meaningfully supervise or monitor Student 2 at PRHS; and

m.      Through other actions, inaction, and deliberate indifference.

310.    The racial harassment Ms. Doe suffered, along with the District's refusal to investigate or take any action in response to reports of the harassment against Ms. Doe, effectively barred Ms. Doe's access to educational opportunities and benefits.

311.    Ms. Doe also has suffered physical, psychological, and emotional harm due to the ongoing race discrimination and the District's failure to take appropriate steps to respond to reports of the racial harassment and prevent further harassment from occurring.

312.    By its actions and inaction, the District acted with deliberate indifference toward the right of Ms. Doe to a safe and secure education environment free from race discrimination, thus materially impairing Ms. Doe's ability to pursue her education at PRHS, in violation of the requirements of Title VI.

313.     As a direct and proximate result of the District's deliberate indifference, Ms. Doe sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

    a.    Past, present, and future physical and psychological pain, suffering and impairment;

    b.    Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

    c.    Impaired educational capacity and future earning capacity;

    d.    Attorneys' fees and costs; and

    e.    Such other and further relief as this Court deems just and proper.

## COUNT VI
## NEGLIGENCE

314.     Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

315.     The District owed Ms. Doe a duty to take appropriate measures to prevent sexual violence against its students.

316.     The District owed a duty to Ms. Doe to act *in loco parentis* and protect Ms. Doe from sexual violence inflicted by Student 3.

317.     The District had a duty to exercise ordinary care to maintain school property in a reasonably safe condition for the use of people whom the District intended and permitted to use the property, including Ms. Doe.

318.     The District had actual notice that Ms. Doe was particularly vulnerable to peer harassment, based on her reports to PRSD administrators in 2018.

319.     Upon information and belief, the District had actual notice of the risk to students at PRHS, like Ms. Doe, caused by Student 3's sexual harassment against female students.

320.    The District possessed unique knowledge that Student 3 posed a particular threat to all female students, including Ms. Doe, and thereby had a duty to protect Ms. Doe from the risk posed by Student 3's sexual harassment at PRHS.

321.    Based on Ms. Doe's unique vulnerability to sexual harassment, future sexual harassment by any student was foreseeable.

322.    Based on the District's actual knowledge of Student 3's dangerous propensity, Student 3's repeated sexual harassment of female students was foreseeable.

323.    The District breached those duties by, *inter alia*:

a.      Failing to promptly and effectively address Ms. Doe's reports of sexual harassment and racial harassment from 2018, thereby rendering her more vulnerable to further harassment and emboldening students to continue harassing her;

b.      Failing to discipline Student 1 or Student 2 after receiving reports of their harassing conduct against Ms. Doe, thereby emboldening other PRHS students to commit assault and/or harassment without fear of consequence;

c.      Supporting perpetrating students over student-victims like Ms. Doe, thereby emboldening and encouraging other PRHS students to commit assault and/or harassment without fear of consequences;

d.      Creating an environment in which student misconduct and harassment was left unchecked and permitted to flourish;

e.      Failing to investigate, address, or otherwise take meaningful corrective action against Student 3 in response to at least one report of Student 3's sexual misconduct prior to Ms. Doe's assault;

f.      Failing to protect all female students, including Ms. Doe, from the known risk that Student 3 posed to them;

g.      Failing to have or communicate policies for reporting unsafe student behavior to administrators;

h.      Failing to train administrators, employees, staff, and/or volunteers on proper supervision of students;

i.      Failing to monitor the hallways during school hours;

j.      Failing to monitor the bathrooms during school hours;

k.      Failing to have a system in place to account for the whereabouts of students during class periods;

l.      Failure to ensure the bathrooms and hallways were cleared following class changes;

m.      Failing to institute appropriate training, policies, and procedures related to student-on-student sexual harassment for administrators, staff, students, and parents;

n.      Failing to provide appropriate and adequate training to administrators, teachers, staff, volunteers, students, and families concerning sex discrimination and sexual harassment against students; Title IX and/or student-on-student sexual harassment; and identifying, investigating, reporting, preventing, and remedying the effects of student-on-student sexual harassment;

o.      Failing to respond promptly and effectively after receiving a report of a violent rape that occurred on school property, during school hours;

p.      Failing to investigate and/or discipline Student 3 related to Ms. Doe's report of sexual assault;

q.      Failing to remedy the hostile environment that existed at PRHS following Student 3's assault of Ms. Doe;

r.      Attempting to transfer Ms. Doe out of PRHS to an alternative high school and thereby prioritizing Student 3's education over Ms. Doe's;

s.      Maintaining a policy of refusing to investigate reports of student-on-student sexual assault;

t.      Retaining an unqualified and biased individual to conduct a sham investigation of Ms. Doe's report of sexual assault over a year after the assault occurred and was reported; and

u.      Was otherwise negligent.

324.    As a direct and proximate result of the District's negligence, Ms. Doe sustained and continue to sustain injuries for which she is entitled to be compensated, including but not limited to:

a.      Past, present, and future physical and psychological pain, suffering and impairment;

b.    Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

c.    Impaired educational capacity; and

d.    Such other and further relief as this Court deems just and proper.

325.    The District is not entitled to immunity under Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. §§ 8541–8564, because Ms. Doe's negligence claim falls under the exception to immunity set forth in § 8542(b)(9) applicable to sexual abuse caused by the District's negligence.

**COUNT VII**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

326.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

327.    The negligence and recklessness of Defendant caused Ms. Doe severe emotional distress, anxiety, and mental anguish.

328.    Plaintiff suffered from severe emotional distress as a result of Defendant's negligence related to its failure to respond appropriately to Student 3's prior sexual misconduct and failure to take meaningful corrective action to prevent Student 3 from engaging in further misconduct and harassment of other female students.

329.    Ms. Doe suffered from severe emotional distress with physical manifestations as a result of Defendant's negligence related to its failure to respond appropriately to Ms. Doe's report of sexual harassment and assault by Student 3, investigate Ms. Doe's report of sexual harassment and assault by Student 3, impose disciplinary action against Student 3 for his harassment and assault of Ms. Doe, or take meaningful corrective action to protect Ms. Doe from further harassment by Student 3 and facilitate her return to PRHS.

330.    Ms. Doe has suffered from increased emotional distress as a result of the District negligently and recklessly allowing Student 3 to remain in school at PRHS after the sexual assault and harassment, thereby prohibiting her from accessing her education.

331.    Plaintiff also suffered from severe emotional distress as a result of Defendant's negligence related to its failure to respond appropriately to Ms. Doe's reports of sexual and racial harassment by Student 1 and Student 2, and failing to take any meaningful steps to protect Ms. Doe from further harassment.

332.    Ms. Doe has suffered from severe emotional distress as a result of the District's negligence in maintaining a policy of refusing to investigate reports of student-on-student sexual assault and harassment, thereby creating an environment in which such misconduct is tolerated and emboldening students to engage in such misconduct without consequence.

333.    Ms. Doe has suffered from severe emotional distress as a result of the District's negligence in failing to train its staff, administrators, employees, and/or volunteers on recognizing, preventing, investigating, and/or responding to reports of student-on-student sexual harassment.

334.    Ms. Doe has suffered from severe emotional distress as a result of the District's negligence in failing to train its staff, administrators, employees, and/or volunteers on recognizing, preventing, investigating, and/or responding to reports of student-on-student racial harassment.

335.    As a direct and proximate result of the District's negligence, Ms. Doe sustained and continue to sustain injuries for which she is entitled to be compensated, including but not limited to:

        a.    Past, present, and future physical and psychological pain, suffering and impairment;

    b.      Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

    c.      Impaired educational capacity; and

    d.      Such other and further relief as this Court deems just and proper.

336.    The District is not entitled to immunity under Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. §§ 8541–8564, because Ms. Doe's negligence claim falls under the exception to immunity set forth in § 8542(b)(9) applicable to sexual abuse caused by the District's negligence.

## **PRAYER FOR RELIEF**

Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendant, awarding Plaintiff her compensatory damages in an amount to be established at trial, equitable relief, reasonable attorneys' fees and costs, legal interest, and such other relief as the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff respectfully demands a trial by a jury.

[Signature block on following page.]

Date: September 16, 2022                    By: /s/ Laura E. Laughlin
                                                 Laura E. Laughlin (PA 311896)
                                                 Messa & Associates
                                                 123 S. 22nd Street
                                                 Philadelphia, PA 19103
                                                 T: (215) 568-3500
                                                 F: (215) 568-3501
                                                 llaughlin@messalaw.com

                                                 Chloe M. Neely*
                                                 Monica H. Beck*
                                                 The Fierberg National
                                                 Law Group, PLLC
                                                 161 East Front Street, Suite 200
                                                 Traverse City, MI 49684
                                                 T: (231) 933-0180
                                                 F: (231) 252-8100
                                                 cneely@tfnlgroup.com
                                                 mbeck@tfnlgroup.com
                                                 *pro hac vice motions to be filed

                                                 *Attorneys for Plaintiff*